**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DAVID EVANS III, RASHID MUHAMMAD,** ) | |
| **MONTA SERVANT, FELISHA PARNELL,** ) | |
| **DWIGHT ANDERSON, JOSEPH TINOCO,** ) | |
| **and FRANK DONIS, on behalf of** ) | |
| **themselves and all others similarly** ) | |
| **situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 20 C 2453** |
| **v.** ) | |
| ) | **Judge Rebecca R. Pallmeyer** |
| **THOMAS J. DART, Sheriff of Cook County,** ) | |
| **COUNTY OF COOK, ILLINOIS, a unit of** ) | |
| **local government as joint employer for** ) | |
| **FLSA purposes and as indemnitor,** ) | |
| **RAMON D. WILLIAMS (Individual** ) | |
| **Capacity), and ANTHONY MCGEE** ) | |
| **(Individual Capacity),** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are correctional officers for the Cook County Department of Corrections ("CCDOC"). In March of 2020, to prevent the spread of COVID-19, they began spending approximately 20 to 30 minutes washing and sanitizing their uniforms, persons, and personal protective equipment ("PPE") before and after their shifts. Plaintiffs seek minimum wage and overtime compensation for time spent engaging in these decontamination and sanitation activities. *See* Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207 (Counts 1 and 2). Plaintiff Rashid Muhammad alleges, further, that by failing to pay him as promised for a particular assignment, Defendants Thomas J. Dart (Sheriff of Cook County) and Cook County violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq*. (Count 3). Plaintiff David Evans III alleges that Defendants Ramon D. Williams and Anthony McGee, the President and Vice President, respectively, of the International Brotherhood of Teamsters Local 700 ("Local

1

700" or "Union") retaliated against him for bringing this suit in violation of 29 U.S.C. § 215(a)(3) of FLSA (Count 4) and in violation of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a) (Count 5). The court has federal question jurisdiction over Counts 1, 2, 4, and 5 under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law IWPCA claim (Count 3) under 28 U.S.C. § 1367.

Before the court are four motions to dismiss. First, Defendant Dart moves to dismiss Counts 1–3 for improper venue and to compel arbitration, or, in the alternative, to compel joinder of Local 700 as a necessary and indispensable party. Defendants Williams and McGee have filed separate motions to dismiss Counts 4 and 5 for failure to state a claim. Finally, Defendant Cook County moves to dismiss Counts 1–3 for failure to state a claim. For the reasons provided below, the court denies Defendant Dart's motion to dismiss for improper venue and denies the motion to compel joinder of Local 700, grants Defendant Williams's motion to dismiss, grants Defendant McGee's motion to dismiss, and denies Defendant Cook County's motion to dismiss.

## **BACKGROUND**

At this stage of the proceedings, the court accepts the factual allegations in Plaintiffs' Second Amended Complaint ("SAC") as true. Plaintiffs David Evans III, Rashid Muhammad, Joseph Tinoco, Frank Donis, Felisha Parnell, Monta Servant, and Dwight Anderson are correctional officers at the CCDOC. (SAC [16] ¶¶ 5–11.) Plaintiffs work eight to sixteen hour shifts inside the CCDOC (*id* ¶ 32–33), sometimes overseeing isolated, quarantined, and COVID-19 positive detainees. (*Id*. ¶ 34.) By necessity, Plaintiffs work in close proximity with other officers and detainees, and monitor the safety and security of those detainees. (*Id*. ¶¶ 35–36.) Defendant Dart oversees the CCDOC in his capacity as Sheriff of Cook County (*id*. ¶ 13), while Defendant Cook County is responsible for the payment of Plaintiffs' wages. (*Id*. ¶ 14–15.) According to Plaintiffs, Dart is an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and Cook County is a joint employer for purposes of the FLSA and the IWPCA. (SAC ¶¶ 13–15 (citing 820

2

ILCS 115/2), ¶ 24.)  Regardless whether Cook County is a "joint employer," it is undisputed that Cook County pays Plaintiffs' wages.  The court construes Plaintiffs' claims against Dart as wage claims against Cook County.

## I.      Facts Relating to All Plaintiffs

On March 9, 2020, Illinois Governor J.B. Pritzker declared that all counties in Illinois were disaster areas in response to the COVID-19 pandemic.  (*Id*. ¶ 27.)  Defendant Dart has sent numerous emails and memoranda to staff, including Plaintiffs, encouraging them to follow guidance from the Centers for Disease Control and Prevention ("CDC") regarding PPE and hygiene.  (*Id*. ¶¶ 29, 43.)  Correctional officers have nevertheless tested positive for COVID-19 at a higher rate than the general population in Cook County.  (*Id*. ¶ 37.)  As of April 8, 2020, the Cook County Jail had the largest known COVID outbreak in the United States (*id*. ¶ 28); since then, at least two correctional officers have died from exposure to COVID-19 within the CCDOC. (*Id*. ¶¶ 30–31.)

To prevent the spread of COVID-19, Plaintiffs have been engaging in extensive decontamination, cleaning, and sanitizing activities (collectively, "decontamination activities") at the beginning and end of their shifts.  (*Id*. ¶ 38.)  Such activities include "washing and sanitizing their uniforms, sanitizing their persons, sanitizing and maintaining [PPE], and showering."  (*Id*. ¶ 20.)  Plaintiffs perform decontamination activities before a shift, to minimize the introduction of COVID-19 to the Cook County Jail, and after a shift, to avoid bringing COVID-19 home to their families.  (*Id*. ¶ 39.)  Plaintiffs allege that these activities are for the benefit of Defendants Dart and Cook County, and that decontamination activities "constitute integral and indispensable parts of the Sheriff's principal activities," which include "providing safe and secure housing, transporting, overseeing, and monitoring [ ] detainees."  (*Id*. ¶ 40.)  Plaintiffs have each spent approximately 20 to 30 minutes at the beginning and/or end of their shifts engaging in decontamination activities (*id*. ¶¶ 45–51), but have not been paid for this time.  (*Id*. ¶ 44.)

3

Plaintiffs believe that they and similarly situated correctional officers are owed unpaid wages—for at least one workweek between March 9, 2020 and the date this suit was filed—for decontamination activities at the beginning and end of their shifts. (*Id.* ¶¶ 5–11, 20.) A collective bargaining agreement ("CBA") governs their pay and working conditions, but that agreement, Plaintiffs contend, is silent as to decontamination activities.[1] (*Id* ¶ 53.) They contend, further, that there is no custom or practice to pay for decontamination activities and that decontamination activities have never been the subject of collective bargaining between the Cook County Sheriff's Office ("CCSO") and Plaintiffs' union, Teamsters Local 700. (*Id.* ¶ 54.)

The CBA, which names both Cook County and the CCSO as "joint employers," contains bargained-for provisions concerning employer rights, overtime policy and procedures, temporary reassignments, rates of pay, overtime compensation, safety and working conditions, and the grievance process.[2] Of particular relevance for this case, the employer rights provision states:

> The Employer has the right to take any and all actions as may be necessary to carry out the duties and responsibilities of the employer *in situations of civil emergency* as may be declared by the employer. It is the sole discretion of the employer to determine that civil emergency conditions exist, which may include but not be limited to riots, civil disorders, tornado conditions, floods, other emergency conditions, *or other circumstances beyond the control of the employer which call for immediate action* whereas it may be required to assign employees as the Employer deems necessary to carry out its duties and responsibilities. Upon completion of the emergency assignment, the Officer shall be returned to his original assignment immediately.

---

[1]  Defendant Dart has attached the CBA as an exhibit to his motion to dismiss. (*See* Collective Bargaining Agreement between International Brotherhood of Teamsters, Local No. 700 and The County of Cook/Cook County Sheriff, As Joint Employers (hereinafter "CBA"), Ex. A to Def. Dart's Mot. to Dismiss [21-1].) The court may take judicial notice of the CBA without converting the motion into a motion for summary judgment. *See* FED. R. EVID. 201(b); *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."); *Minch v. City of Chicago*, 486 F.3d 294, 300 n.3 (7th Cir. 2007) (taking judicial notice of a CBA where both sides cited and relied upon the CBA and "the authenticity of the document is unquestioned").

[2]  These provisions are quoted in relevant part in the Appendix.

(CBA, Section 2.1 (emphases added).)  Article XI details the procedure for filing grievances, which are defined as "difference[s] between an employee or the Union and the employer with respect to the interpretation or application of, or compliance with the terms of this Agreement between the Employer and the Union."  (CBA, Section 11.2.)  If the Union is unsatisfied with the first two steps of the grievance process, it must submit the grievance to binding arbitration.  (CBA, Section 11.4.)

In Counts 1 and 2, Plaintiffs allege that Defendants Dart and Cook County (collectively, "Cook County Defendants") have violated the FLSA's minimum wage and overtime provisions. *See* 29 U.S.C. §§ 206, 207.  Specifically, the Cook County Defendants "suffered or permitted" Plaintiffs and similarly situated correctional officers to work by engaging in decontamination activities.  (*Id*. ¶¶ 63–65.)  In Count 1, they seek their "straight-time rates of pay," in accordance with their years of service, for 20 to 30 minutes before and after their shifts, between March 9, 2020 and the cessation of COVID-19 protocols at the CCDOC.  (*Id*. ¶ 66.)  In Count 2, they seek unpaid overtime rates of pay, in accordance with their years of service, for weeks when they worked more than 40 hours in a workweek.  (*Id*. ¶ 71.)  Plaintiffs also seek certification of a collective action on both counts.

## II.     Facts Relating to Plaintiff Muhammad and Similarly Situated Officers

On March 27, 2020, CCSO Superintendent Martha Yoksoulian sent an email to correctional officers, including Plaintiff Rashid Muhammad, offering time-and-a-half pay for officers who volunteered to work at the Mental Health Transition Center ("MHTC") while detainees who had tested positive for COVID-19 were housed there.  (*Id*. ¶ 57.)  The email noted, however, that "it has not been decided if it [the additional compensation] will be in time or pay."  (*Id*.)  Plaintiff Muhammad replied to the email, noting that he was "interested in volunteering . . . if and only if the time and a half is for pay.  I'm not interested in putting myself in potential harms [sic] way for time on the books."  (*Id*.)  The CCSO "accepted Muhammad's offer," Plaintiffs allege, by

transferring him to the MHTC, along with "numerous other officers," beginning March 30, 2020. (*Id.* ¶ 59.)

Plaintiff Muhammad alleges that as of April 17, 2020, he and the other officers who volunteered to work at the MHTC have not been paid time-and-a half, either as compensatory time or pay. (*Id.* ¶ 60.) According to Muhammad, Defendants Dart and Cook County "entered into an agreement" with him and similarly situated officers for time-and-a-half pay (for Muhammad), or either time-and-a-half pay or compensatory time (for other officers). (*Id.* ¶ 73.) Plaintiff Muhammad alleges that Defendants' failure to pay him and the other officers violates the IWPCA, and he seeks recovery of all unpaid overtime wages while these officers were stationed at the MHTC.[3] (*Id.* ¶ 77.)

### III.    Facts Relating to Plaintiff Evans

Defendant Ramon D. Williams is the President and Chief Executive Officer of Teamsters Local 700, the union representing Cook County correctional officers, including Plaintiffs. (SAC ¶ 16.) Both Williams and Defendant Anthony McGee, the Vice President of Local 700, took office in January 2020 after an election in November 2019. (*Id* ¶¶ 17–18.) Plaintiff David Evans III was elected as Chief Union Steward of Local 700 in January of 2020. (*Id.* ¶ 55.) Stewards are responsible for investigating and presenting grievances in accordance with the CBA, collecting dues, and transmitting messages and information from the Union or its officers.[4] It is unclear from

---

[3]      Plaintiff Muhammad has not specified the provision of the IWPCA at issue, but the court infers that he is invoking § 14(a), which provides: "Any employee not timely paid wages . . . by his or her employer . . . shall be entitled to recover . . . in a civil action . . . the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." 820 ILCS 115/14(a). (*See* SAC ¶ 77 (using similar language).)

[4]      According to Local 700's bylaws, "The authority of Stewards shall be limited to, and shall not exceed, the following duties and activities:

1) The investigation and presentation of grievances with his Employer or the designated company representative in accordance with the provisions of the collective bargaining agreement;

the briefs or the CBA whether stewards are "employed" by Local 700 or whether they receive compensation for their service. The court notes, however, that Local 700's Bylaws provide that "Stewards shall be appointed and may be removed at will by the principal officer," which is defined elsewhere as the President. (Bylaws, Section 13(B)(1) and Section 8(A) ("Duties of the Principal Executive Officer").) Plaintiff Evans believes that Williams and McGee retaliated against him "in a way directly benefitting the Sheriff and Cook County."[5] (*Id.* ¶ 85.)

After Plaintiffs filed their initial complaint on April 21, 2020, Defendant Williams sent a letter to Plaintiff Evans on April 30, 2020. (*See* Letter from Williams to Evans of 4/30/20 (hereinafter "Williams Letter 4/30/20"), Ex. A to SAC [16-1] at 1.)[6] In the letter, Williams wrote that he and the Union first learned of the lawsuit on April 22, 2020, and pointed out that when "specifically asked" during a conversation with the Union's Chief Legal Counsel that same day "to identify any COVID-19 related concerns," Evans had made no mention of the lawsuit. (*Id.*) Williams noted that the Union had "concerns about the complaint because it implicates the terms and conditions of employment of our bargaining unit at [CCDOC]." (*Id.*) The letter states that "the Union has been

---

2)  The collection of dues when authorized by appropriate Local Union action;
3)  The transmission of messages and information, which shall originate with, and are authorized by the Local Union or its officers. . . .

(Teamsters Local Union No. 700 Bylaws (hereinafter "Bylaws"), Section 13(C) (cited in Williams Letter 4/30/20 at 2), Ex. B to Def. McGee's Mot. to Dismiss [37-2] at 7–8.) Furthermore, "Stewards have no authority to take strike action, or any other action not set forth in these Bylaws, or any other action interrupting the business of his employer, except as specifically authorized by official action of the Local Union." (*Id.*)

[5]     The SAC alleges that Williams and McGee engaged in retaliatory actions "against Plaintiff Evans, and the others," referring to the named Plaintiffs and others similarly situated. (SAC ¶ 85; *see also id.* ¶¶ 105, 110.) In their brief in opposition to Defendant Williams's motion to dismiss, however, Plaintiffs clarify that only Plaintiff Evans is pressing a retaliation claim. (Pls.' Resp. in Opp'n to Def. Williams's Mot. to Dismiss [53] (hereinafter "Pls.' Opp'n to Williams MTD") at 4, 10 n.2.)

[6]     The court may consider materials outside the pleadings when ruling on a motion to dismiss for improper venue. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809–10 (7th Cir. 2011).

negotiating with the CCDOC over COVID-19 issues since March," resulting in a "Letter of Agreement regarding extra compensation for unit employees assigned to isolation, quarantine tiers or emergency housing related to COVID-19." (*Id.*) Plaintiffs concede that the Union reached an agreement with the CCSO in April of 2020 for an extra half-hour of compensatory time for correctional officers working with COVID-19-positive detainees.[7] (SAC ¶ 110 n.3.) Plaintiffs insist this agreement "has nothing whatsoever to do with" their claims for time spent on decontamination activities. (*Id.*) Williams directed Evans to report to the Union's office on May 7, 2020 with all documentation and evidence related to this suit. In closing, Williams wrote, "I am not taking issue with your right to participate in a lawsuit against the CCDOC. I am, however, deeply concerned about the bargaining unit members' issues and contractual rights, and the Union relies on you to police those issues and bring those issues to the Union's attention." (Williams Letter 4/30/20.)

Also on April 30, 2020, Plaintiffs' counsel, Cass Casper, received a letter from Sherrie Voyles, an attorney representing Williams and McGee. (*Id.* ¶ 92; Letter from Voyles to Casper of 4/30/30 (hereinafter "Voyles Letter"), Ex. B to SAC [16-2].) The letter requested similar information and raised similar concerns about the implications of the lawsuit for Local 700's CBA. According to Voyles, "Not only has Mr. Evans failed to file any grievances over the issues raised in the complaint, he has failed to bring any of the issues to the Union's attention." (Voyles Letter at 1.) Voyles's letter took issue with a Facebook post in which Plaintiffs' counsel accused the Union of witness tampering by discouraging members from participating in the lawsuit. (*Id.* at 2.) Voyles requested that Plaintiffs' counsel take down the post if he lacked "a proper basis for concluding the Union is engaging in, or authorizing, witness tampering." (*Id.*) Finally, Voyles wrote, "The Union has also requested that I remind you as the Union's former counsel, that you

---

[7]     *See Union and Sheriff's Office Agree to Extra Compensatory Time for CCDOC Members Working with COVID-19 Positive Detainees*, TEAMSTERS LOCAL 700 (Apr. 17, 2020), https://teamsterslocal700.com/2020/04/17/union-and-sheriffs-office-agree-to-extra-compensatory-time-for-ccdoc-members-working-with-covid-19-positive-detainees/ (last visited June 3, 2021).

do owe various obligations under applicable ethical rules, and you owe certain duties to the union as a member, even though you are on a withdrawal card."[8]  (*Id.*)

Plaintiffs' counsel responded to Voyles's letter with his own letter, in which he detailed incidents of alleged harassment and discrimination against Evans since he was elected in January of 2020.[9]  (*Id.* ¶ 93; *see* Letter from Casper to Voyles of 4/30/20, Ex. C to SAC [16-3].)  Only two of those incidents postdate the filing of Plaintiffs' initial complaint on April 21.  First, on April 24, 2020, the Union's then-Communications Director Mindy Saban was fired by Williams "for no stated reason."  (SAC ¶ 93 (xvi).)  It is unclear from the SAC whether Saban was a friend or ally of Evans, or what other reason Evans may have had for asserting that her firing was retaliatory.  Second, on April 27th, Williams and McGee allegedly handpicked two people to serve in the Union Office without consulting Evans.  (*Id.* ¶ 93 (xvii).)  Evans believes that Williams and McGee selected these people "precisely for the purpose of drowning out Evans'[s] voice among the membership and diluting any remaining influence he had in the Union Office."[10]  (*Id.* ¶ 93 (xviii).)

Plaintiff Evans alleges that Williams's letter falsely accuses him of "keeping the Union in the dark about COVID-19 concerns."  (*Id.* ¶ 89.)  To the contrary, Evans contends, it was Williams

---

[8]     The parties have not made clear how Casper, an attorney in private practice, also maintains membership in Local 700.  The court notes that, according to Local 700's website, a withdrawal card allows a member to maintain membership on an inactive basis without paying dues.  *See Withdrawal Card Request*, TEAMSTERS LOCAL 700, https://teamsterslocal700.com/contact-us-2/withdrawal-card-request/ (last visited June 3, 2021).

[9]     The court notes with dismay the unprofessional tone of Plaintiffs' counsel's letter, a letter riddled with sarcastic rhetorical questions and screenshots of text messages airing interpersonal conflicts between union members.  Such communication reflects poorly on the legal profession and are inconsistent with the court's expectations.  *See Standards for Professional Conduct within the Seventh Federal Judicial Circuit* 1–3, http://www.ca7.uscourts.gov/forms/Seventh_Circuit_Standards_for_Professional_Conduct.pdf (last visited June 3, 2021) (discussing lawyers' duties to other counsel).

[10]     It appears from the record that the parties' animosity predates Williams and McGee's discovery of Evans's lawsuit.  Evans believes Williams and McGee undermined him from the time he took office as Chief Union Steward in January 2020, as reflected in social media posts and text messages that the court need not explore in detail for purposes of this ruling.

and McGee who froze Evans out by intentionally excluding him from discussions with the CCDOC about COVID-19 (*id*. ¶ 91), and systematically undermined his performance as Chief Union Steward. (*Id*. ¶ 95.) On May 7, 2020, Plaintiffs filed their First Amended Complaint ("FAC") [8], this time bringing FLSA retaliation claims against Williams and McGee. (*Id*. ¶ 96.) Evans then posted the FAC on Facebook, which he believes put Williams and McGee on notice that they had been named as defendants although they had not yet been served. (*Id* ¶ 97.)

On May 11, 2020, Williams removed Evans as Union Steward "without explanation." (*Id*. ¶ 98; *see* Letter from Williams to Evans of 5/11/20 (hereinafter "Williams Letter 5/11/20") Ex. D to SAC [16-4].) The Union's Chief Legal Counsel hand-delivered the removal letter to Evans at the CCDOC Union Office that morning, "in front of nearly all of the Assistant Chief Stewards[ ] and several other CCDOC Officers." (*Id*. ¶ 99.) The following day, Williams sent a letter to all union members explaining his decision to remove Evans as Union Steward. (*Id*. ¶ 103; *see* Letter from Williams to Union Members of 5/12/20 (hereinafter "Williams Letter 5/12/20"), Ex. E to SAC [16-5].) The letter states that "we [the Union] have no issue and do not dispute any individual's right to participate in a lawsuit against the CCDOC," and "[t]he decision to remove [Evans] has nothing to do with his participation in a lawsuit." (Williams Letter 5/12/20 at 1.)

Unsurprisingly, Plaintiff Evans disagrees. He believes that the letter falsely claims his removal was due to his failure to notify the Union about COVID-related issues, when in fact it was retaliatory. (SAC ¶¶ 103, 106.) He further alleges that Defendant McGee "participated in and agreed to the acts of retaliation" against him. (*Id*. ¶ 104.) Moreover, he alleges that Williams and McGee's actions were not taken in their capacity as officers or agents of Local 700 because their actions were "directly or indirectly in the interest of the employer in relation to the employee."[11] (*Id*. ¶¶ 108–09 (citing 29 U.S.C. § 203(d)).)

---

[11] Although they have now backed off the argument, Plaintiffs asserted that Williams and McGee are liable as employers within the meaning of the FLSA because they harmed this lawsuit (allegedly for the benefit of the Cook County Defendants) and removed Evans from his

Plaintiff Evans insists that the exhaustion of internal remedies against Williams and McGee would be futile. (*Id*. ¶ 131.) Local 700's Bylaws require him to file charges and seek a hearing before the Local 700 Executive Board, but Williams and McGee oversee the Executive Board. As a result, "he has no hope of receiving a fair hearing." (*Id*. ¶¶ 131–32.) Evans further alleges that he has already contacted, through counsel, the Public Services Division of the International Brotherhood of Teamsters "on multiple occasions," but has not received a response. (*Id*. ¶ 133.) Evans believes that by removing him as Chief Union Steward, Williams and McGee infringed upon his right to sue and his freedom of speech, in violation of the Labor Management Reporting and Disclosure Act ("LMRDA"). (*Id*. ¶ 135.)

## DISCUSSION

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a complaint must contain "enough factual matter (taken as true)" to suggest that a plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Courts generally "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In other words, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

As noted, four motions to dismiss are pending. Defendant Dart moves to dismiss under FED. R. CIV. P. 12(b)(3) for improper venue and to compel arbitration, or, in the alternative, to

---

position as Union Steward. (*Compare* SAC ¶¶ 111, 120, *with* Opp'n to Williams MTD at 9.) Plaintiffs offer no support for such a theory, and the court is aware of none. The mere fact that a union official acts "in the interest of the employer in relation to the employee" does not render the union official liable as an employer and would lead to absurd results: for example, it would discourage a union official from reporting criminal wrongdoing on the part of a union member, lest the union official thereby be deemed an "employer."

compel joinder of Local 700 as a necessary and indispensable party under FED. R. CIV. P. 12(b)(7). Defendants Williams and McGee have each submitted motions to dismiss Plaintiffs' FLSA retaliation and LMRDA allegations for failure to state a claim. Defendant Cook County has moved to dismiss for failure to state a claim because it is not Plaintiffs' "joint employer" for FLSA purposes; if the court nonetheless determines that Cook County is a joint employer, it seeks to compel arbitration or compel joinder of Local 700 for the same reasons outlined in Defendant Dart's motion.

## I.    Defendant Dart's Motion to Dismiss

Defendant Dart moves to dismiss for improper venue and to compel arbitration under Rule 12(b)(3), or, in the alternative, to compel joinder of Local 700 under Rules 12(b)(7) and 19(a). As explained here, however, the court concludes that Plaintiffs' claims for compensation set forth in Counts 1–3 are not governed by the terms of the CBA. (*See* CBA, Ex. A to Def. Dart's Mot. to Dismiss [21-1].) The court therefore overrules Dart's venue challenge and denies the motion to compel joinder of Local 700.

### A.  Motion to Compel Arbitration

Motions to compel arbitration concern venue and are properly brought under Rule 12(b)(3). *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011) (collecting cases); *Gratsy v. Colo. Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015). "When ruling on a motion to dismiss for improper venue, the district court is not obligated to limit its consideration to the pleadings [or to] convert the motion to one for summary judgment if the parties submit evidence outside the pleadings." *Faulkenberg*, 637 F.3d at 809–10 (internal quotation marks and citation omitted). Accordingly, the court may consider the language of the CBA to determine whether Plaintiffs' claims are subject to mandatory arbitration. *See IBEW Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (citing *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)); *see also Minch v. City of*

12

*Chicago*, 486 F.3d 294, 300 (7th Cir. 2007) (taking judicial notice of a CBA). In making the determination, the court is mindful that "the law and public policy favor arbitration, and [ ] the party seeking arbitration is entitled to the benefit of the doubt." *IBEW Local 2150*, 762 F.3d at 594; *see also Gateway Coal Co. v. Mine Workers*, 411 U.S. 368, 378–79 (1974). "Where the arbitration clause is broad, [courts] presume arbitrability of disputes[, and] where any ambiguity as to the scope of the clause exists, we will construe it in favor of the party seeking arbitration." *IBEW Local 2150*, 762 F.3d at 594 (citations omitted). Ultimately, "a court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032–33 (7th Cir. 2012) (citations and internal quotation marks omitted).

Defendant Dart argues that the CBA addresses the claims set forth in Counts 1–3 of the SAC, meaning that Plaintiffs are required to arbitrate their claims against the Cook County Defendants. Specifically, Defendant Dart contends that Plaintiffs' FLSA and IWPCA claims for unpaid wages concern compensation and working conditions, which are mandatory subjects of bargaining. (*See* Def. Dart's Mot. to Dismiss (hereinafter "Dart MTD") [21] at 7 (citing CBA, Sections 3.3 (Overtime Policy and Procedures), 3.4 (Overtime Compensation), and 13.2 (Safety and Working Conditions), and Article V (Rates of Pay).) Dart also notes that the allegations in the SAC implicate Section 2.1 (Employer Rights), which provides: "The Employer has the right to take any and all actions as may be necessary to carry out the duties and responsibilities of the employer *in situations of civil emergency*," including "*circumstances beyond the control of the employer which call for immediate action* whereas it may be required to assign employees as the Employer deems necessary to carry out its duties and responsibilities." (CBA, Section 2.1 (emphases added).) According to Dart, the COVID-19 pandemic qualifies as a "civil emergency," and the question whether the CCSO may require or encourage correctional officers to engage in

13

decontamination activities under the "civil emergency" language necessitates interpretation of the CBA. (*See* Dart MTD at 8.) Defendant Dart further argues that whether and how much correctional officers should be paid for decontamination activities in a civil emergency falls within the CBA's grievance and arbitration clause. The CBA defines "grievance" broadly as "a difference between an employee or the Union and the employer with respect to the interpretation of, or application of, or compliance with the terms of this Agreement between the Employer and Union." (CBA, Section 11.2.)

Plaintiffs counter that the CBA is silent as to decontamination activities and there is no custom or practice to pay for such activities, so they are entitled to pursue their claims in federal court. (*See* Pl.'s Resp. in Opp'n to Def. Dart's MTD (hereinafter "Opp'n to Dart MTD") [38] at 2.) As Plaintiffs note, courts have recognized that "donning and doffing" may constitute an integral and indispensable part of a primary work activity under the FLSA. (*Id.* at 4 (citing *Steiner v. Mitchell*, 350 U.S. 247, 250–53 (1986).) Indeed, the FLSA creates a default rule that donning and doffing time is compensable as time worked. *See* 29 U.S.C. § 203(o).[12] In other words, unless a CBA expressly excludes donning and doffing from compensable time, it counts. *See Mitchell v. JCG Indus.*, 929 F. Supp. 2d 827, 834 (N.D. Ill. 2013). In response to Defendant Dart's reliance on the "civil emergency" language in Section 2.1 of the CBA, Plaintiffs suggest that the employer's invocation of this provision would mean that the CBA is no longer in effect, so they are not required to arbitrate. (*See* Opp'n to Dart MTD at 8.) Because Dart "suspended" the CBA during a "civil

---

[12] The FLSA defines "hours worked" as follows:

In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, *there shall be excluded* <u>any time spent in changing clothes or washing at the beginning or end of each workday</u> *which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement* applicable to the particular employee.

29 U.S.C. § 203(o) (emphases added).

14

emergency," Plaintiffs say, their only recourse is to bring claims under the FLSA and the IWPCA. (*Id.* at 9.)

The court agrees with Defendant Dart that the CBA permits the CCSO to assign correctional officers as it deems necessary during a civil emergency. Section 2.1 provides that the employer has the right to declare a civil emergency, and during this time the employer may take "any and all actions as may be necessary," including "assign[ing] employees as the Employer deems necessary to carry out its duties and responsibilities." (CBA, Section 2.1.) The court assumes, further, that the COVID-19 pandemic rises to the level of a "civil emergency," which the CBA defines as, among other things, "circumstances beyond the control of the employer which call for immediate action." (*Id.*) Plaintiffs themselves note that the CCDOC has been the center of a major outbreak of COVID-19 (SAC ¶¶ 28, 37), and that Defendant Dart has sent multiple emails and memoranda urging correctional officers to follow CDC guidance on sanitation and the use of PPE. (SAC ¶¶ 29, 43.) Plaintiffs do not provide any support for their assertion that invoking the civil emergency clause would "suspend" the CBA in its entirety, including the grievance and arbitration provisions. Such a reading does not make logical sense because it would destabilize the CCDOC's operations in a time of crisis. (*See* Def. Dart's Reply [42] at 4.)

The court believes that Defendant Dart overstates the case, however, when he asserts that Section 2.1 means that the CCSO can assign additional duties to correctional officers without paying for them. As Plaintiffs have pointed out, the provision is silent as to "decontamination activities," and it says nothing about pay for such activities. Moreover, there is no longstanding practice on this issue because COVID-19 is unquestionably an unusual occurrence. The CBA simply does not contemplate decontamination pay, so the court concludes "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Gore*, 666 F.3d at 1032–33; *see also Bell v. Se. Pa. Transp. Auth.*, 733 F.3d 490, 493–95 (3d Cir. 2013) (denying defendant's attempt to compel arbitration where plaintiffs'

15

FLSA claims did not require interpretation of CBAs). Because Plaintiffs have rebutted the presumption of arbitrability on Counts 1–3, the court denies the motion to dismiss for improper venue.

### B. Compulsory Joinder

Having concluded that the litigation can proceed in federal court, the court turns to the question whether the correct parties are before it. Rule 19(a), "Persons Required to Be Joined if Feasible," provides:

> (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> > (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> > (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> > > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> > > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1). In the labor context, "[a] union may be found to be a party to be joined if feasible under Rule 19(a) in actions brought by employees against their employers requiring an adjudication that might have a significant impact on the collective-bargaining agreement because of the union's interest in the operation of that contract." 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1620 (3d ed. 2021); *see also Hayes v. Schenley Affiliated Brand Corp.*, No. 79 C 3833, 1980 U.S. Dist. LEXIS 12672, *6 (N.D. Ill. July 14,1980) ("The mere possibility of conflicting obligations frequently dictates joinder of a union in cases involving labor disputes.").

If the court denies the motion to dismiss for improper venue, Defendant Dart argues in the alternative that Local 700 should be joined as a necessary party under Rule 19. First, the Union is subject to service of process and its joinder would not deprive the court of subject-matter jurisdiction. *See* FED. R. CIV. P. 4(k). Second, Defendant Dart argues that the absence of Local

700 would prejudice the Union's interest in the matter, or subject the CCSO to a substantial risk of incurring inconsistent obligations. The court agrees that the Union has a clear interest in advocating for its members, many of whom are or may become plaintiffs in this suit. In documents that Plaintiffs themselves have attached to the SAC, Defendant Williams, as President of Local 700, has said as much. (*See* Williams Letter 4/30/20 at 1 (noting that "the Union has been negotiating with CCDOC over COVID-19 issues since late March" and that "[Plaintiffs'] claims implicate these and other provisions of the collective bargaining agreement").) But because the court has concluded that the CBA does not speak to the claims raised in Counts 1–3, it is unclear how proceeding without the Union would prejudice its interest. If Plaintiffs ultimately prevail, Union members will benefit; if Plaintiffs are unsuccessful, the Union would still be free to pursue its interest in other ways, including through collective bargaining.

The court also disagrees with Defendant Dart that failure to join Local 700 would subject the CCSO to a substantial risk of incurring inconsistent obligations. The Union or one of its members could conceivably file a grievance concerning decontamination activities, but if the CBA is silent as to those activities, then there is nothing for the arbitrator to interpret. Alternatively, even if an arbitrator concluded that the CBA covers decontamination pay, this court could resolve any discrepancy by limiting its judgment to correctional officers who are parties to this lawsuit and tailoring any amount owed to those officers. *See, e.g.*, *Scott v. City of New York*, 340 F. Supp. 2d 371, 383–84 (S.D.N.Y. 2004) (concluding joinder of unions in FLSA action was unnecessary where plaintiffs sought only money damages, unions did not claim interest in the action, and risk of inconsistent obligations was "relatively insignificant" because unions would lack standing under the FLSA). At worst, Cook County Defendants would be subject to inconsistent adjudications as to the amount of damages owed to various correctional officers, not conflicting obligations to the same officers. *See* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1604 (3d ed. 2021) ("The key is whether the possibility of being subject to multiple obligations

is real; an unsubstantiated or speculative risk will not satisfy the Rule 19(a) criteria."). The court therefore denies the motion to compel joinder.

## II.    Defendant Cook County's Motion to Dismiss

Defendant Cook County's brief in support of its motion to dismiss draws upon the same arguments in Defendant Dart's brief regarding arbitration and joinder. The court denies Defendant Dart's motion for the reasons discussed above, so it also denies Defendant Cook County's motion as to arbitration and joinder. In the alternative, Defendant Cook County moves to dismiss for failure to state a claim, arguing that it is not a joint employer with Defendant Dart for purposes of the FLSA. (Def.'s Mot. to Dismiss (hereinafter "Cook County MTD") [41] at 5–7.)

The parties have spilled much ink on this question, but it ultimately does not matter whether Cook County is a joint employer for purposes of the FLSA—either way, it needs to remain in this suit as indemnitor for the CCSO. *Carver v. Sheriff of LaSalle Cty., Illinois*, 324 F.3d 947, 948 (7th Cir. 2003) ("[A] county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity."). The court accordingly denies Defendant Cook County's motion to dismiss for failure to state a claim.

## III.    Defendant Williams's and Defendant McGee's Motions to Dismiss

Defendants Williams and McGee have each moved to dismiss Plaintiffs' FLSA retaliation and LMDRA claims (Counts 4 and 5) for failure to state a claim. The same attorney represents both Defendants and has made the same arguments on their behalf, but Plaintiffs' factual allegations against Defendant Williams differ from those concerning Defendant McGee. Accordingly, the court will address their motions separately.

### A.  Defendant Williams

Plaintiff Evans's FLSA retaliation claim against Defendant Williams is based on the theory that "any person" is subject to the anti-retaliation provision. *See* 29 U.S.C. § 215(a)(3). Evans's

18

LMRDA claim hinges on the notion that Local 700 is a covered labor organization, despite the fact that public-sector unions are generally not covered. As explained below, these arguments lack merit, and the court grants Defendant Williams' motion to dismiss Counts 4 and 5.

### 1. FLSA Retaliation

The FLSA provides that "it shall be unlawful for *any person* . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3) (emphasis added). The FLSA defines "person" as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." *Id*. § 203(a). But Section 216(b), FLSA's civil enforcement provision, provides civil liability for "[a]ny *employer* who violates the provisions of section 215(a)(3)." *Id*. § 216(b) (emphasis added). Section 203(d), in turn, defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." *Id*. § 203(d).

Plaintiff Evans argues that "any person" in the FLSA retaliation provision should be read broadly to include third parties, such as Williams and McGee. (SAC ¶ 80; Pl.'s Resp. in Opp'n to Def. Williams's MTD (hereinafter "Opp'n to Williams MTD") [53] at 4–9.) For support, Evans points to an early Third Circuit decision holding that the term "person" applies to labor unions and their officers. *See Bowe v. Judson C. Burns, Inc.*, 137 F.2d 37, 39 (3d Cir. 1943). In *Bowe*, employees sued their employer for FLSA overtime violations, and they were allegedly threatened with discharge by their employer and expulsion by the union. *Id*. at 37. When the employer and the union made good on those threats, the employees sued their employer, their union, and union officers for FLSA retaliation, alleging that the defendants conspired to force the plaintiffs to abandon their suit. *Id*. The court's statutory analysis was brief, but it ultimately concluded that

19

the union and its officers could be liable for retaliation under § 215(a)(3).  *Id*. at 38–39.  More recently, the Ninth Circuit applied *Bowe*'s interpretation, concluding that "Congress clearly means to extend section 215(a)(3)'s reach beyond actual employers."  *Arias v. Raimondo*, 860 F.3d 1186, 1191 (9th Cir. 2017).  In *Arias*, an employee sued his employer's attorney for FLSA retaliation, alleging that the attorney plotted to have the employee taken into custody by immigration authorities.  *Id*. at 1187.

Defendant Williams agrees that courts have interpreted the FLSA broadly, *see, e.g.*, *Katsen v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11–14 (2011) (interpreting "filed any complaint" in § 215(a)(3) broadly to include oral complaints), but he argues that Plaintiffs' expansive reading of "any person" is unsupported by case law.  (*See* Def. Williams's Br. in Support of Mot. to Dismiss (hereinafter "Williams MTD") [35] at 5 & n.4; Def. Williams Reply [57] at 2–3.)  According to Williams, *Bowe* is distinguishable because the plaintiffs there alleged a conspiracy between the union and the employer, and Plaintiff Evans has not made such an allegation in this case.  (Williams MTD at 6–7.)  Williams contends that courts have appropriately limited FLSA retaliation liability to persons acting in the employer's interest with respect to the employment relationship.  (*Id*. at 6 (citing *Diaz v. Longcore*, 751 F. App'x 755, 755–59 (6th Cir. 2018)).)  Thus, in *Diaz*, the Sixth Circuit held that an employer's attorney in a wage-and-hour action could not be sued for FLSA retaliation, where the attorney merely filed a counterclaim against the employees, because "he was not a person acting on behalf of the actual employer . . . *with respect to the employment relationship*, such as by hiring, supervising, paying, and managing employees on behalf of [the employer]."  *Diaz*, 751 F. App'x at 759 (emphasis in original).  The *Diaz* court declined to follow *Arias*, remarking that "bad facts make bad law," and "there is no textual indication that Congress created broader liability in private anti-retaliation lawsuits than it did in private wage-and-hour lawsuits."  *Id*.  The Sixth Circuit observed that Congress created criminal liability for "[a]ny *person* who willfully violates" Section 215, but it created a private right of action

20

only against "any *employer*." *Id.* (emphases added) (comparing § 216(a) with § 216(b)). In any event, *Arias* and *Diaz* were arguably closer cases than this one because the defendants in question were the employers' attorneys and therefore were acting as agents of the employers.

In the absence of binding precedent from the Seventh Circuit on this issue, the court considers whether the reasoning in *Bowe* and *Arias* is more persuasive than that of the Sixth Circuit in *Diaz*. In other words, does "any person" in § 215(a)(3) literally mean *any person*, or must the defendant have some connection to the employment relationship? In support of *Diaz*'s narrower reading, Defendant Williams notes that even in those cases where courts held that a defendant not subject to liability for wage or overtime pay may be liable for retaliation, the defendant was an employer in the traditional sense of the word. *See Sapperstein v. Hager*, 188 F.3d 852 (7th Cir. 1999); *Acosta v. Foreclosure Connection, Inc*., 903 F.3d 1132 (10th Cir. 2018). In *Sapperstein*, the Seventh Circuit held that the owners of a bike shop could be liable for FLSA retaliation even though the employers' business did not meet the $500,000 sales minimum for liability under §§ 206 and 207. *Sapperstein*, 188 F.3d at 857 ("Congress made it illegal for any person, not just an 'employer' as defined under the statute, to retaliate against any employee for reporting conduct 'under' or 'related to' violations of the federal minimum wage or maximum hour laws, whether or not the employer's conduct does in fact violate those laws."). Similarly, in *Acosta*, the Tenth Circuit held that a construction company could be liable for FLSA retaliation against a construction worker regardless of whether the employer is "engaged in commerce" as required for liability under § 207. *Acosta*, 903 F.3d 1132, 1135–36 (citing *Sapperstein*, 188 F.3d at 856–57). As Williams reads these cases, they illustrate that courts understand "any person" (for purposes of a retaliation claim) to mean someone "acting in the employer's interest with respect to the employment relationship." (Williams MTD at 6). Plaintiff Evans responds that Williams qualifies even under Defendant's preferred standard because "the union does play a role in controlling Plaintiffs' terms and conditions of employment." (Opp'n to Williams MTD at 6.)

21

The court agrees with Defendant Williams that Plaintiff Evans's interpretation of "any person" stretches the statute too far, and that the *Diaz* court's approach is more consistent with the FLSA's text and structure. To incur liability under the FLSA retaliation provision, therefore, a person must be acting on behalf of the employer with respect to the employment relationship. *See Diaz*, 751 F. App'x at 759. Based on the facts alleged in the SAC, Defendant Williams does not meet this standard. Evans insists that Williams alone "exercises control over every right and obligation listed in the CBA as the President/CEO of the Plaintiffs' union" (Opp'n to Williams MTD at 6), but he does not allege that Williams has the power to "hir[e], supervis[e], pay[ ], and manag[e] employees" on behalf of the employer. *Diaz*, 751 F. App'x at 759. Contrary to Plaintiff's belief, Williams's various letters to Evans do not establish that he "controlled" Evans's employment with the CCSO. (*See* Opp'n to Williams MTD at 8.) Williams may have the power to remove Evans as Chief Steward under the Local 700 Bylaws, but nothing before the court suggests he has power to terminate or otherwise alter Evans's employment as a correctional officer at the CCDOC.

Ultimately, *Bowe* is the only case that Plaintiff Evans has identified where a court held that union officers may be liable for FLSA retaliation.[13] In that case, however, the plaintiff employees alleged a conspiracy between their employer and their union to bully them into dropping their initial FLSA suit. *Bowe*, 137 F.2d at 37. Plaintiff Evans also cites the following cases: *Rivera v. Installation Club Sys.*, 623 F. Supp. 269, 271 (D.C.P.R. 1985) (holding that a federal government

---

[13]    In light of the dearth of case law regarding FLSA retaliation by union officers, the court suspects Plaintiff Evans's concerns may be more appropriately addressed by the Illinois Labor Relations Board. *See* Illinois Public Labor Relations Act, 5 ILCS 315/5 (establishing the State Panel and the Local Panel of the Illinois Labor Relations Board); 5 ILCS 315/10(b) (defining unfair labor practices by a labor organization or its agents). For example, in *Metro. All. of Police v. State Lab. Rels. Bd., Loc. Panel*, a Cook County correctional officer filed an unfair labor practice charge with the ILRB, alleging that his union violated Section 10(b)(1) of the IPLRA when it refused to arbitrate his grievance in retaliation for his activities in support of a rival union. 345 Ill. App. 3d 579, 583–84, 803 N.E.2d 119, 121–23 (1st Dist. 2003).

agency could be liable under FLSA's retaliation provision); *Donovan v. Schoolhouse Four, Inc.*, 573 F. Supp. 185, 190 (W.D. Va. 1983) (holding that a plant manager and consultant engaged in plant operations could be liable under FLSA's retaliation provision).  As Defendant Williams notes, however, these cases do not support a conclusion that union officers may be liable under § 215(a)(3).  (*See* Williams MTD at 7.)  They instead offer additional examples of cases where courts have applied § 215(a)(3) to defendants who are "employers," or agents of employers, in the ordinary sense of the word.  The court concludes that, in the absence of an alleged conspiracy between the employer and the union or its officers, union officers like Defendant Williams are not liable under the FLSA retaliation provision.[14]

Even if the court were to conclude that Defendant Williams is covered by § 215(a)(3), he argues that Plaintiff has failed to allege a prima facie case of FLSA retaliation.  To do so, a plaintiff must allege that (1) he engaged in activity protected by the FLSA, (2) his employer took an adverse employment action against him, and (3) a causal link exists between the two.  *See Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018).  Defendant appears to concede that Plaintiff Evans engaged in statutorily protected activity by filing this suit (*see* Williams MTD at 11), but William contends that Evans has not plausibly alleged that he suffered an adverse employment action.  In arguing that he has done so, Evans identifies the following: the Williams letters of April 30, May 11, and May 12, 2020; the Voyles letter of April 30, 2020; and his removal

---

[14]    Defendant Williams also contends that he is not liable for FLSA retaliation because he is categorically excluded from FLSA's definition of "employer."  *See* 29 U.S.C. § 203(d) (providing that an employer "*does not include* any labor organization (other than when acting as an employer) or *anyone acting in the capacity of officer or agent of such labor organization*.") (emphases added).  In the SAC, Plaintiff Evans alleges that he has been "employed" by Local 700 as its Chief Union Steward and that he was required to report to Defendants Williams and McGee.  (SAC ¶ 81.)  He also alleges that Williams and McGee were not acting in their capacity as union officers when they retaliated against him.  (*Id* ¶¶ 108–09 (citing 29 U.S.C. § 203(d).)  In his response brief, however, Plaintiff Evans withdraws the suggestion that Defendants Williams or McGee are "employers" for purposes of his FLSA retaliation claim.  (*See* Opp'n to Williams MTD at 9; Def. Williams Reply at 2.)  Accordingly, the court need not consider this theory further.

from the position of Chief Union Steward. (*See* Opp'n to MTD at 10; Ex. A, B, D, and E to SAC.)

None of these incidents appear to be actionable. The April 30th letters, which were sent after

Plaintiffs filed their original complaint on April 21, do not constitute adverse *employment* actions:

the April 30th Williams letter merely requested information supporting Evans's FLSA allegations

and asked him to attend a meeting at the Union office on May 7; the Voyles letter was addressed

to Plaintiff's counsel, not Evans, and it did not threaten or imply that the Union had the ability to

affect Evans's employment with the CCDOC. Defendant Williams's removal of Plaintiff Evans on

May 11 was in some sense an adverse action, but Evans has not alleged that his removal

negatively impacted his *employment* with the CCDOC.[15]

Evans's claim that loss of his Union Steward position was a product of retaliation would

have to surmount an additional hurdle: causation. A plaintiff may show causation through direct

or circumstantial evidence, which may include "(1) suspicious timing, ambiguous statements or

behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a

pretextual reason for adverse employment action." *Kasten v. Saint-Gobain Performance Plastics

Corp.*, 703 F.3d 966, 973 (7th Cir. 2012). Plaintiff argues that he has pleaded both suspicious

timing and ambiguous statements because the May 11th removal letter offered "no explanation,"

---

[15]    Plaintiff Evans explains for the first time in his response brief that his removal "had
the effect of putting Evans back to his former bidded assignment at the CCDOC." (Opp'n to
Williams MTD at 8.) He further asserts that "the Chief Union Steward has special job
responsibilities and works a special detail in the Union Office," but it is unclear how many hours
a week Evans spent on his Union duties as opposed to his work as a correctional officer. (*Id.* at
11 (citing CBA, Articles 11.6–11.8).) For example, the CBA provides that Stewards "will be
permitted to handle and process grievances referred by employees at the appropriate steps of
the grievance procedure without loss of pay, provided that the operations of the Employer are not
adversely affected[,]" and that Stewards "will be excused without loss of pay or benefits for the
purpose of attending quarterly Union steward meetings . . . ." (CBA, Article 11.6.)
    These new assertions might support a claim that Evans suffered an adverse employment
action when he was removed as Chief Steward, but Evans cannot salvage his SAC by pleading
new facts in a response brief. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146–47 (7th
Cir. 2010) (a plaintiff may offer additional facts "consistent with the well-pleaded complaint" if the
operative complaint contains "sufficient factual material to state a plausible claim"). Without more,
the court is unable to infer that Evans's removal as Chief Union Steward negatively impacted his
employment relationship with the CCDOC.

while the May 12th letter explained that his removal was for failure to report grievances to Union leadership. (Opp'n to Williams MTD at 12.) He also insists that Williams's explanation for removing him was pretextual, pointing to a series of incidents—most of which predate the filing of the initial complaint—that indicate Evans had a poor relationship with Williams and McGee. (*Id.* (citing SAC ¶ 93).) Those circumstances undermine the notion that it was this lawsuit that caused his removal. Evans's best argument rests on timing: he was removed just days after naming Williams as a Defendant in this lawsuit. But even that fact is not overwhelming on this record; Evans alleges that the retaliation began well before the filing of the First Amended Complaint. The court notes, further, Williams's request, in the April 30 letter, that Evans attend a meeting on May 7. Evans has not alleged that he attended that meeting, and his non-attendance may constitute an independent reason for his removal.

The court concludes that Defendant Williams is not covered by the FLSA retaliation provision, and that Evans has not alleged that he suffered an adverse employment action for exercising his rights under the FLSA. Williams's motion to dismiss Count 4 is granted.

### 2. LMRDA Claim

The LMRDA sets forth a bill of rights for members of labor organizations, including the freedom of speech and protection of the right to sue. *See* 29 U.SC. §§ 411(a)(2) (freedom of speech and assembly), 411(a)(4) (right to sue); *Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526, 536–37 (1984) ("Title I [of the LMRDA] is designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline."). Plaintiff Evans argues that removal of an elected union official chills the speech of the elected official and the members who voted for him. (SAC ¶ 125 (citing *Glover v. Ossey*, 1995 WL 374029, *5–6 (N.D. Ill. 1995); *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 355 (1989)).) Accordingly, he brings a claim against Defendants

25

Williams and McGee for violating his rights under the LMRDA. (SAC ¶ 125 (citing 29 U.S.C. § 412).)[16]

Defendant Williams responds that the LMRDA does not apply to public-sector unions like Local 700, which consist entirely of government employees. (Williams MTD at 12–17.) The LMRDA applies to a "labor organization" that deals with an "employer" as those terms are defined in the Act. *See* 29 U.S.C. § 402(e), (i). The LMRDA defines "labor organization" as "a labor organization engaged in an industry affecting commerce . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, . . . ." *Id.* § 402(i). In turn, the LMRDA defines "employer" as:

> any employer or any group or association of employers *engaged in an industry affecting commerce* (1) which is, with respect to employees engaged in an industry affecting commerce, an employer within the meaning of any law of the United States relating to the employment of any employees or (2) which may deal with any labor organization concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and includes any person acting directly or indirectly as an employer or as an agent of an employer in relation to an employee *but does not include* the United States or *any corporation wholly owned by the Government of the United States or any State or political subdivision thereof.*

---

[16] In the SAC, Plaintiffs allege that they are suing Defendants Williams and McGee in their individual capacities, not in their official capacities, because they were acting outside the scope of their duties as union officers. (*See* SAC ¶¶ 109. 117, 118, 120.) Defendant Williams argues that the LMRDA only provides for liability against a covered labor organization or a union officer acting under the color of union authority. (Williams MTD at 12 (citing *Keene v. Int'l Union of Operating Eng'rs., Local 624*, 569 F.2d 1375, 1381 (5th Cir. 1978); *Morissey v. Nat'l Maritime Union of Am.*, 544 F.2d 19, 24 (2d Cir. 1976).) Plaintiff Evans does not address these cases in his response brief; instead, he argues that he is entitled to plead that Williams and McGee were acting outside the scope of the duties for purposes of FLSA retaliation, but under the color of union authority for purposes of his LMRDA claims. (Opp'n to Williams MTD at 17–18 (citing SAC ¶¶ 129–130).) Because the court ultimately concludes that Local 700 is not a covered labor organization, it is irrelevant whether the SAC properly alleged that Williams and McGee were acting under the color of union authority for purposes of Plaintiff's LMRDA claims. That said, the court is uncertain how Williams and McGee could have had any authority to remove Evans if they were not acting in their role as union officers.

26

29 U.S.C. § 402(e) (emphases added). Defendant Williams argues that § 402(e)(2) specifically carves out local governments from the definition of employers, so labor organizations representing public-sector employees do not fall within § 402(i)'s definition of "labor organization." *See* 29 C.F.R. § 451.3(a)(4) ("The term 'political subdivision' includes, among others, counties and municipal governments."). Department of Labor ("DOL") regulations have further clarified that "[a] labor organization composed entirely of employees of the governmental entities excluded by [29 U.S.C. § 402(e)] would not be a labor organization for the purposes of the Act . . . ." *Id*. Moreover, "in the case of a national, international or intermediate labor organization composed both of government locals and non-government or mixed locals, the parent organization as well as its mixed and non-government locals would be 'labor organizations' and subject to the Act," but local unions "composed entirely of government employees would not be subject to the [LMRDA]." *Id*.

Plaintiff Evans insists that Local 700 is nonetheless covered by the LMRDA because it is a labor organization "engaged in an industry affecting commerce." (SAC ¶¶ 127, 128 (citing 29 U.S.C. § 402(j).) Specifically, Local 700 includes correctional officers who are "required to utilize, carry, maintain, and purchase guns and ammunition, vests, and uniforms not exclusively purchased within the State of Illinois, and who utilize Crown Victoria vehicles not manufactured in the State of Illinois." (SAC ¶ 128 (citing *United States v. Morales-Rodriguez*, 467 F.3d 1, 10 (1st Cir. 2006).) Next, Plaintiff Evans argues that Local 700 is a covered labor organization because it has on-staff officers and employees, including Defendants Williams and McGee, who pay dues but work for the Union as "purely private sector employees." (SAC ¶ 128 (citing *Morales-Rodriguez*, 467 F.3d at 10; *Laity v. Beatty*, 766 F. Supp. 92, 97–98 (W.D.N.Y. 1991).) Finally, he suggests that Local 700 is a covered labor organization because it is subordinate to Teamsters Joint Council 25, which includes private-sector members. (SAC ¶ 128 (citing *Ala. Educ. Ass'n v. Chao*, 455 F.3d 386, 394–95 (D.C. Cir. 2006).)

None of these arguments are persuasuive.  First, the notion that the court should look only at the first part of the LMRDA's definition of "employer" is illogical.  To some extent, all employers, including government employers, are "engaged in an industry affecting commerce" if they use or purchase equipment that was not manufactured in their own state.  But if the court were to adopt Plaintiff's reading, all or nearly all public-sector unions would be covered by the LMRDA.  Surely Congress would not have intended the first part of § 402(e) to negate the express exclusion of government employers in the second half of the definition.  *See, e.g.*, *Senne v. Vill. of Palatine, Illinois*, 784 F.3d 444, 447 (7th Cir. 2015) ("[S]tatutes have to be interpreted to avoid absurd results.").

Next, Plaintiff's suggestion that Local 700 is a covered labor organization because it employs some private-sector employees, including Defendants Williams and McGee, is a nonstarter.  Creating this loophole to the LMRDA's exclusion of public-sector unions would once again erase the exclusion itself.  *See Rodriguez v. Haynes*, 341 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) ("If plaintiffs' argument were accepted, any union including its employees as members would defeat the private sector requirement established by the LMRDA, a result Congress did not intend.").  The cases Evans cites in support of his proposed interpretation are easily distinguishable.  *Laity v. Beatty* involved a mixed union (representing both private and public sector employees), which the applicable regulations make clear are covered by the LMRDA.  766 F. Supp. 92, 97–98 (W.D.N.Y. 1991); *see* 29 C.F.R. § 451.3(a)(4).  In *United States v. Morales-Rodriguez*, the union in question was "open to police officers and [private] security guards," suggesting that it too was a mixed union.  467 F.3d 1, 5 (1st Cir. 2006).  Notably, the defendant in *Morales-Rodriguez* was charged with criminal violations of the LMRDA for embezzlement of union funds, complicating the strength of any analogy that Plaintiff Evans might draw from the case.  *See id*. at 7.  The appellate court applied a deferential standard of review to the defendant's arguments challenging the sufficiency of the evidence, and found that a reasonable jury could

conclude that the union was engaged in commerce for purposes of the LMRDA. *Id*. at 10. By contrast, Defendant Williams has identified numerous cases confirming that union officer membership in a public-sector union does not render the union a covered labor organization. *See, e.g.*, *Medford v. Civil Serv. Emps. Ass'n*, 290 F. Supp. 3d 174, 179 (E.D.N.Y. 2017) ("[A] union must actually represent private sector employees in negotiations with employers to be subject to the LMRDA."); *Rodriguez*, 341 F. Supp. 2d at 423 ("Limiting the LMRDA's coverage to unions that *represent* private sector employees comports with the statute's nature and purpose.") (emphasis in original).

Finally, Plaintiff's argument that Local 700 is a covered labor organization because Joint Council 25 includes some private-sector members conflicts with the DOL's own regulations. Joint councils are intermediate bodies, beneath a national or international labor union, that consist of multiple locals—some of which may represent only private-sector employees, only public-sector employees, or both. Under the LMRDA, a joint council is a covered labor organization if the council is "subordinate to a national or international labor organization, which includes a labor organization *engaged in an industry affecting commerce* within the meaning of any of the preceding paragraphs of this subsection, other than a State or local central body." 29 U.S.C. § 402(j)(5) (emphasis added). Again, DOL regulations clarify that "in the case of a national, international or intermediate labor organization composed both of government locals and non-government or mixed locals, the parent organization as well as its mixed and non-government locals would be 'labor organizations' and subject to the Act," but "locals which are composed entirely of government employees would not be subject to the [LMRDA]." 29 C.F.R. § 451.3(a)(4). In other words, the fact that some locals within Joint Council 25 represent private-sector employees, or are mixed, has no effect on the status of purely public-sector locals like Local 700. *See, e.g.*, *Adams v. AFSCME*, 167 F. Supp. 3d 730, 739–40 (D. Md. 2016) (holding that "a local union that represents only public employees is not subject to the LMRDA, and the fact that its

29

parent organization qualifies as a labor organization for purposes of the LMRDA does not change the local union's status").

The cases that Plaintiff cites are perfectly consistent with the DOL's interpretation of the LMRDA. In *Chao v. Bremerton Metal Trades Council, AFL-CIO*, the Ninth Circuit confronted the question whether a joint council, such as the Bremerton Metal Trades Council, was a labor organization within the meaning of the LMRDA. 294 F.3d 1114, 1117–18 (9th Cir. 2002). The court held that the Bremerton Council was a covered labor organization because it was subordinate to the Metal Trades Department of the AFL-CIO, and the Department engaged in industries affecting commerce within the meaning of the LMRDA. *Id*. at 1118. The court had no reason to consider whether the joint council's status as a covered labor organization could be imputed to public-sector locals within it. Plaintiff Evans's reliance on *Ala. Educ. Ass'n v. Chao* is also misplaced because, in that case, the court's decision rested on the DOL's failure to adequately explain its new interpretation of the LMRDA's financial disclosure requirements in light of *Bremerton*. The case has nothing to say about the LMRDA's applicability to public-sector locals. 455 F.3d 386, 396–97 (D.C. Cir. 2006).

The court grants Defendant Williams's motion to dismiss Count 5.

**B. Defendant McGee**

Defendant McGee raises the same arguments as Defendant Williams regarding the inapplicability of FLSA retaliation claims to union officers and the inapplicability of the LMRDA to public-sector unions. (*See* Def. McGee's Br. in Support of Mot. to Dismiss Counts IV and V (hereinafter "McGee MTD") [37] at 1.) McGee further argues that Plaintiff Evans has not established a prima facie case of FLSA retaliation. Again, to state a prima facie case of retaliation under the FLSA, a plaintiff must allege that (1) he engaged in activity protected by the FLSA, (2) his employer took adverse action against him, and (3) a causal link exists between the two.

*See Sloan*, 901 F.3d at 894.  McGee argues that Evans has not pleaded facts sufficient to show that McGee was actively involved in an adverse action against him.  (*See* McGee MTD at 5–8.)

In their response in opposition to Defendant McGee's motion to dismiss, Plaintiffs concede that the SAC "would be improved by a section explaining the relationship between McGee and Williams"; they urge that such a section is unnecessary, however, because "Defendants are already perfectly well aware what that relationship is" and "Defendants are attempting to require fact pleading in a notice pleading jurisdiction."  (Pls.' Resp. in Opp'n to Def. McGee's Mot. to Dismiss (hereinafter "Opp'n to McGee MTD") [51] at 1–2.)  Plaintiffs have, in their response brief, nevertheless offered "suggested additional facts" concerning McGee's role in the alleged retaliation.  (*See id.* at 2–3.)  Defendant McGee objects to this effort to bolster the claims against him by adding facts to the SAC in a response brief.  *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146–47 (7th Cir. 2010) (holding that a plaintiff may offer additional facts "consistent with the well-pleaded complaint" if the operative complaint contains "sufficient factual material to state a plausible claim"); *Glick v. Koenig*, 766 F.2d 265, 268 (7th Cir. 1985) ("[A] district court is justified in denying an amendment if the proposed amendment could not withstand a motion to dismiss.") (citations omitted)).  Whether or not the bolstering is proper here, it appears that Evans's "additional facts" are little more than assertions that Williams and McGee worked together, that McGee was aware of Williams's activities, and that Williams took no action without McGee's approval.  In any case, the court has concluded that Plaintiff Evans's FLSA retaliation and LMRDA claims against Defendants Williams and McGee fail as a matter of law, and declines to address facts regarding Defendant McGee in any further detail.  The court also denies Plaintiff Evans's request for leave to amend the SAC.  (*See* Opp'n to McGee MTD at 4.)

31

## CONCLUSION

For the foregoing reasons, Defendant Dart's and Cook County's motions to dismiss [21, 41] are denied and Defendants Williams and McGee's motions to dismiss [34, 36] are granted. The parties are directed promptly to meet and confer and propose a pretrial schedule in a joint written status report to be submitted on or before June 30, 2021.


ENTER:


Dated:  June 8, 2021

_____
REBECCA R. PALLMEYER
United States District Judge

## APPENDIX

The CBA between Local 700, the CCSO, and Cook County contains the following provisions:

### Section 2.1 Employer Rights

…

> B. The Union recognizes the exclusive rights of the Employer to hire, transfer, promote, discipline and suspend employees for just cause and to establish reasonable work rules, make work assignments, determine schedules of work, methods, processes and procedures by which work is to be performed, place, methods, means and number of personnel needed to carry out the Employer's responsibilities and duties as well as the right to determine reasonable work, productivity, reasonable performance and evaluation standards.

> C. The Union recognizes that the Employer has the right to change existing or introduce new methods, equipment or facilities and the right to contract for goods and services.

The Employer has the right to take any and all actions as may be necessary to carry out the duties and responsibilities of the employer in situations of civil emergency as may be declared by the employer. It is the sole discretion of the employer to determine that civil emergency conditions exist, which may include but not be limited to riots, civil disorders, tornado conditions, floods, other emergency conditions, or other circumstances beyond the control of the employer which call for immediate action whereas it may be required to assign employees as the Employer deems necessary to carry out its duties and responsibilities. Upon completion of the emergency assignment, the Officer shall be returned to his original assignment immediately.

### Section 3.3. Overtime Policy and Procedures

Contingent upon the needs of the Employer, qualifying Officers/Investigators will be afforded the opportunity to work extra hours/shifts at their regular rate of pay plus a premium. Officers/Investigators shall be given a minimum of four (4) hours of overtime pay or compensatory time (of their choosing) for any overtime they volunteer to work, and are notified by the Employer that they will be working, … Officers/Investigators may work less than four (4) hours (and be paid for the hours worked) only after the Officer/Investigator and the Employer designee, and only after the Officer/Investigator has been chosen to work overtime according to the voluntary overtime procedure outlined in section B1 of this article has been followed.

…

### Section 3.3.A Temporary Reassignments

The Employer agrees not to temporarily transfer bidded officers, instructors, or investigators who are bidded to divisions or units, to other divisions or units unless a bidded officer(s), instructor(s) or investigator volunteers. Bidded officers, instructors, or

investigators who volunteer for the temporary transfer and actually work in a different division or unit will receive one (1) hour of compensatory time for that. . . .

**Section 3.4 Overtime Compensation**

Overtime which has been duly authorized or approved shall be compensated as follows: All hours actually worked in excess of eighty (80) hours per biweekly pay period by an Employee shall be compensated at the rate of one and one-half (1 ½) times the regular hourly rate. For purposes of calculating overtime, all compensated hours shall be counted, except sick leave, during a fourteen (14) day period.
…

**Section 5.1 Job Classification**

All bargaining unit employees shall receive the biweekly salary provided for their respective grade and length of service as set forth in Appendix A of this Agreement. Employees will be increased to the appropriate step upon completion of the required length of service in the classification.

**Section 13.2 Safety and Working Conditions**

It is agreed that the Employer is subject to applicable statutory responsibilities in the area of Health and Safety.

**Article XI. Grievance Procedure**

**Section 11.2 Definition**

A grievance is a difference between an employee or the Union and the employer with respect to the interpretation or application of, or compliance with the terms of this Agreement between the Employer and the Union.

**Section 11.4 Grievance Procedure Steps**
…

If the Union is not satisfied with the Step 3 answer, it shall within thirty (30) calendar days after receipt of the Step 3 answer submit in writing to the Employer notice that the grievance is to enter impartial arbitration. … The Union and the Employer will make arrangements with the Arbitrator to hear and decide the grievance without unreasonable delay. The decision of the Arbitrator shall be binding.
…

The Arbitrator, in his/her opinion, shall not amend, modify, nullify, ignore or add to the provisions of this Agreement. The issue or issues to be decided will be limited to those presented to the Arbitrator in writing by the Employer and the Union. His/her decision must be based solely upon his/her interpretation of the meaning or application of the express relevant language of the Agreement.
…

34