**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID EVANS III, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 20-cv-2453 |
| | ) | |
| v. | ) | Hon. Rebecca R. Pallmeyer |
| | ) | |
| THOMAS J. DART, *et al.*, | ) | Hon. Mag. Judge Young B. Kim |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SHERIFF DART'S AND COOK COUNTY'S RESPONSE IN
OPPOSITION TO CONDITIONAL COLLECTIVE ACTION CERTIFICATION**

Plaintiffs' Fair Labor Standards Act ("FLSA") claim should not be conditionally certified as an FLSA collective action, because Plaintiffs have not and cannot show any evidence of a common policy or plan that violated the law. Therefore, Plaintiffs cannot meet the requirement of being similarly situated. Although Plaintiffs David Evans III, Rashid Muhammad, Joseph Tinoco, Frank Donis, Felisha Parnell, Monta Servant and Dwight Anderson ("Plaintiffs"), proclaim in their Motion that the over 3000 putative class members were subject to the same orders, policies and directives relating to personal and gear-related sanitization tasks, they fail to present a single written directive, order, instruction, or even an email ordering or directing them to perform the tasks they claim they engaged in off duty. Moreover, although Plaintiffs, who are all Correctional Officers, seek to certify a collective action that includes employees who hold a significantly different job classification, Investigator II, they present no evidence to support the inclusion of Investigator IIs or what, if any, off duty activities Investigator IIs allegedly performed in their homes. Lastly, if certification is considered, Plaintiffs' proposed notice is deficient in numerous ways, as detailed below.

1

**I.     STANDARDS FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION**

While Plaintiffs' recitation of the legal standards for assessing motions for conditional certification of a collective action is generally consistent with current caselaw, Plaintiffs miss the mark on the most critical element -- showing that they were subject to a common policy that violated the law. Such failure dooms their motion even at this early conditional stage.

Recognizing how well-versed this Court is in the standards applied to a motion for conditional collective action certification, Defendants will simply highlight the basics and then focus more specifically on why Plaintiffs failed to meet their burden for conditional certification. *Dawkins v. NR 1 Transp., Inc.* 2021 U.S. Dist. LEXIS 171092 (N.D. Ill. Sept. 8, 2021) (J. Pallmeyer) (granting a motion for conditional certification, but under distinguishable factual allegations from this case). Under the FLSA, a plaintiff may seek to proceed with the case as a collective action pursuant to 29 U.S. 216(b) (2006), and district courts have wide discretion to manage collective actions. *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010); *see also Hoffman-La Roche v. Sperling*, 493 U.S. 165, 110 S. Ct. 482 (1989). In pursuing a collective action, plaintiffs must show that they are similarly situated. *Vazquez v. Ferrara Candy Co.*, No. 14 C 4233, 2016 U.S. Dist. LEXIS 110554 (N.D. Ill. Aug. 9, 2016) (M.J. Valdez).

Most courts have devised a two-step process for certification. Step one is the conditional certification, and step two is the final certification. *Vazquez*, 2016 U.S. Dist. LEXIS 110554, *10. Plaintiffs' burden increases and is directly proportional to each stage of the discovery process. *Id*. Although the standard for conditional collective action certification is generally lenient at this early stage of a lawsuit, ***it is not automatic***. *Williams v. Estates of Hyde Park, LLC.*, No. 19 C 2288, 2020 U.S. Dist. LEXIS 62453, *4-5 (N.D. Ill., Apr. 9, 2020)(J. Kendall) (emphasis added). Plaintiffs have the burden to make a modest factual showing that potential members of the collective action are similarly situated to plaintiffs. Plaintiffs cannot meet this burden solely by

2

relying on allegations in the complaint, but some evidence must be provided, such as affidavits, depositions, or other documents, to support the allegations that other similarly situated employees were subjected to a common policy that violated the law. *Id.*

In attempting to show similarity, Plaintiffs misdirect the focus to their claimed similar job duties performed in the Jail. (Motion, pp. 2, 6, 9-10) However, the focus must instead be on what is the common policy that allegedly required over 3000 Correctional Officers to perform alleged compensable activities off duty at their personal residences. The facts show that no such common policy exists. Moreover, the intense individualized assessment that would need to be conducted based on the allegations asserted further supports denying certification.

## II.    LEGAL ANALYSIS OF THE RELEVANT FACTS

Plaintiffs' "Factual Background" fails to present a complete or accurate picture of the Cook County Department of Corrections ("CCDOC" or "Jail") during the COVID-19 pandemic and ignores significant efforts taken by the Cook County Sheriff's Office ("CCSO") to protect the health and safety of the detainees and the employees who work in the Jail and to contain the spread of COVID-19 in the Jail. Defendants state from the outset that CCSO greatly appreciates its Correctional Officers, along with all essential workers, who tirelessly worked through the pandemic to ensure our basic governmental functions continued during these unprecedented times.

### A.    The CCSO responds to the pandemic.

In setting the stage for their Motion, Plaintiffs accentuate a single news report issued on April 8, 2020, that the CCDOC was declared the largest known source of COVID-19 infections in the United States, but Plaintiffs omit the fact that the CCDOC was ahead of the curve in conducting COVID-19 screenings and testing at that early stage of the pandemic. As early as January 2020, the CCDOC already had begun conducting screenings in preparation for the influenza season with routine testing of new detainees for flu-like symptoms. It then increased efforts in February and

3

March with the early reports of the pandemic. (Exhibit 1, Declaration of Brad Curry, former Chief of Staff ("Ex. 1") at ¶¶ 1, 8-10, 14) As early as April 6, 2020, the CCDOC already had received approval, arranged for the availability of, and began conducting COVID rapid testing for both detainees and staff. (*Id.* at ¶¶ 33-34)

The overall success of the Sheriff's Office's efforts shows in the numbers. As of March 29, 2020, only nine of the more than 5,600 individuals in custody at the Jail were then positive for COVID-19, and all were positive prior to their arrival at the Jail. (Exhibit 2, Declaration of Hugh Walsh, CCSO's First Assistant Executive Director ("Ex. 2"), ¶¶ 6-7, Ex. 2-A) Shortly thereafter, the CCSO was conducting 1500 COVID-19 tests each week at the Jail. (*Id*) As of July 15, 2020, the Jail had 11 of nearly 5,000 detainees who were COVID-19 positive. Eighty percent of those new cases again came from newly arriving detainees who were identified and isolated at intake. (*Id.*) At that time, the positive rate at the Jail had dipped below 1%. (*Id.*) On November 12, 2020, the Jail had a prior five-month average positivity rate fluctuating between 1% and 2%. (*Id.*) As of November 2020, even when the positivity rates had increased to 15.2% for general population of Cook County and 14.5% for the City of Chicago, due to the efforts being made in the Jail, the Jail's positivity rate had risen to only 2.97%. (*Id.*) As of February 2021, the CCDOC had a 0.3% seven-day rolling average positivity rate. (*Id.*) Cook County Jail had been identified by the U.S. Centers for Disease Control and Prevention ("CDC") as a model for jails and prisons. (*Id.*)

The CCDOC's efforts of painstakingly planning and preparing for the COVID pandemic are detailed in the case *Mays, et. al v. Dart*, 974 F.3d 810 (7th Cir., 2020).[1] In *Mays*, the Sheriff's Office provided declarations and submitted a wealth of documents demonstrating its significant

---

[1] In *Mays v. Dart*, 974 F.3d 810 (7th Cir., Sept. 8, 2020), detainees sued on Due Process grounds alleging failure to provide them reasonably safe living conditions during the pandemic.

4

proactive efforts. (*See* Ex. 1 and 3, declarations submitted in *Mays*, Case No. 20-cv-02134, Dkt. Nos. 31-3 and 31-2 (J. Gettleman)) Specifically, the Sheriff, who is responsible for operating the CCDOC, took numerous steps to prevent the spread of COVID-19 with the first reports of the pandemic. *Mays*, 974 F.3d 814-816 and Ex. 1, *generally*. Initially, the Sheriff's Office mobilized operational and administrative teams, consulted with numerous experts in the field and at other agencies, and began implementing protocols at the Jail, in conjunction with Cermak Health Services (Cermak) medical staff, to prevent a wide-spread infection in the Jail. (*Id.*) CCSO partnered with Cermak, Chicago Department of Public Health, Illinois Department of Public Health, the criminal justice stakeholders of Cook County, Unions, and Cook County Department of Health. (*Id.*)

There is no question that a correctional facility presents unique challenges in controlling the spread of infection. The CCDOC consists of a single site compound over 96 acres, comprised of 11 Divisions and numerous administrative buildings. (Ex. 1, ¶ 6). Healthcare and emergency medical responses are managed within the Jail by Cermak. (*Id.*)

On March 23, 2020, the CDC issued Guidance on Management of COVID-19 in Correctional and Detention Facilities, which the Sheriff's Office immediately implemented to the extent it was not already performing the recommended protocols. *Mays*, 974 F.3d at 814-815. The Sheriff's Office continually reviewed and implemented applicable and continuing updated CDC protocols during a time when the entire world was learning how to manage the novel and highly contagious coronavirus. (Ex. 1, ¶ 21) The CDC guidance for correctional facilities does not recommend any at-home activities that Plaintiffs allege performing. (*Id.*)

The Sheriff's Office also has been proactive in reducing the Jail population; implementing screening, isolation, and treatment protocols; implementing preventive measures and distributing

personal protective equipment; and protecting the Jail staff from infection and transmission, including on ingress and egress. *Mays*, 974 F.3d 814-816 and Ex. 1. Concrete steps were taken to implement those plans, including but not limited to:

- Instituting employee protocols and policies such as screening of employees reporting to the Jail, advising employees to stay home if they were symptomatic, modifying the return-to-work process, and providing additional paid leave benefits;

- Coordinating with elected officials, and other governmental agencies, to receive priority access to the national stockpile of Personal Protective Equipment ("PPE") in Illinois;

- Obtaining and distributing PPE to staff and detainees;

- Engaging consultants to improve sanitization policies, policies relating to medical screening, and use of PPE;

- Enforcing use and training on the use of PPE by Jail staff and social distancing;

- Increasing disinfection and sanitization protocols in the Jail, including providing adequate sanitation supplies to staff and detainees;

- As early as April 1, 2020, obtaining approval to administer a rapid test for COVID at the Jail and for staff at a local hospital;

- Limiting visitors and access to the Jail and movement of detainees within the Jail;

- Reducing the Jail population through securing release or electronic monitoring for over 1,200 detainees;

- Following the CCHHS, CDPH, and CDC guidance with respect to isolation and quarantine of detainees who have experienced COVID-19 symptoms or have been exposed, including creating separate tiers to separate those individuals from the general population;

- Establishing a space for new detainees to quarantine before entering the general population;

- Reopening three closed divisions of the Jail to create more single-cell units and reduce density and moving 175 tiers to single-cell housing and reducing dormitory capacity to below fifty percent, with certain exceptions; and

- Increased single-cell housing at the Jail by approximately 545% and decreased double-celled housing at the Jail by over 90%.

(Ex. 1, ¶¶ 8-36; and Exhibit 3, Declaration of Matthew Burke, Executive Director of Human Resources of the Sheriff's Office, ¶¶ 4-17). In *Mays*, the Court acknowledged the "significant, and impressive, effort the Sheriff had undertaken." *Mays*, 974 F.3d at 817.

### B. The CCDOC's applicable policies and COVID-related communications.

Despite the wealth of written directives and other information that was being provided to the CCDOC staff, Plaintiffs do not provide a single directive or communication requiring them to perform any "sanitization" tasks while off duty at home.

#### 1. Policies and Communications directly with Correctional Officers

Plaintiffs do not even reference the CCSO's comprehensive and lengthy COVID policy applicable to Correctional Officers. (Ex. 2, ¶ 3, Ex. 2-B). None of the provisions in the COVID policy require Correctional Officers to engage in "sanitization" activities off duty, but instead pertain to on-duty obligations, only. (*Id.*) Moreover, on a near daily basis, the CCSO disseminated information and directives relating to conduct at the Jail to detainees and staff regarding screening, social distancing, obtaining supplies, and who to contact with any concerns. (Ex. 1, ¶¶ 20-24, Group Ex. 1-A)

Additional daily messages were sent to staff regarding a wide variety of pandemic related issues. (Ex. 1, Group Ex. 1-A) Those messages included helpful data, information on keeping safe, the importance of mental health, updates on CDC guidance, PPE guidance, procedural changes and reporting pathways. (*Id.*). For example, the CCDOC sent out "tips of the day," which sometimes included the CDC guidance explaining how to stay safe during a pandemic. Those messages included the same CDC guidance that was directed to the general public, such as frequent hand washing and wiping down door handles and other frequent touch points. (*Id.*) As noted in *Mays*, society took many precautionary steps to curb the spread of COVID-19, including abiding by stay-at-home orders, wearing face coverings, physical distancing, disinfecting touch points in

7

their homes and cars, wiping down groceries, washing clothes more frequently, and, of course, frequent handwashing or use of hand sanitizers. *Mays*, 974 F.3d 814.

None of these communications directed Plaintiffs to perform any tasks off duty. In fact, when mask mandates were issued either by the State of Illinois or City of Chicago, the CCSO acknowledged that it could not dictate what Correctional Officers did off duty, but instead, at certain roll calls in July 2020, it merely encouraged Correctional Officers to comply with the mandates and wear face coverings when in public spaces. (Ex. 2, ¶ 5, Ex. 2-C).

### 2. Frequent communications with Plaintiffs' Union.

Moreover, the CCDOC was in constant, daily communications with the various collective bargaining units and their union representatives, including the Teamsters Local 700 who represent the CCDOC's Correctional Officers (the "Union"). These communications were critical to ensure that staff were safe, and their concerns were heard. (Ex. 1, ¶ 22) Despite the close contact maintained between the Sheriff's Office and the Union, the Union advised the CCDOC that it was not aware of any claims of its members of alleged "sanitization" tasks being performed off duty until this lawsuit was filed. (Exhibit 4, Declaration of Peter Kramer, along with Ex. 4-A). To date, no grievances have been filed raising the issues asserted in this lawsuit. (*Id.*) Further, the County and the Union agreed to four different modifications to the collective bargaining agreement to address Correctional Officers' concerns related to the pandemic, including providing hazard pay, but none of those modifications involved any claims of uncompensated off the clock work. (*Id.*)

### C. The CCDOC's timekeeping policies require pre-approval for overtime.

Further, none of the Plaintiffs claim that they reported these alleged off duty activities or sought to be compensated for the time in accordance with the CCDOC's timekeeping policy. The CCDOC's timekeeping policy requires obtaining approval to work overtime. (Ex. 2, ¶ 4) The CCDOC's Policy Manual, Policy 119, states that overtime is "authorized hours worked in excess

8

of 40 hours per week or as defined by an applicable collective bargaining agreement, except for certain exempt members as permitted by law." (*Id.*, Ex. 2-B, §119.1.2) All hours worked are required to be accurately recorded in the Cook County's electronic timekeeping system ("CCT"), to which members have direct access to ensure the accuracy of their time worked. (*Id.*, §119.2) Members are required to submit overtime worked for approval in the CCT system. (*Id.*, §119.3) The Timekeeping Policy expressly states that members are to clock in and out to record their hours worked and any missed swipes need to be immediately reported to a supervisor and the member is required to submit a missed swipe form. The supervisor then needs to complete and submit a time edit request. A member is subject to discipline for not correctly recording time worked. (*Id.*, §119.4) Any overtime worked is mandated to be recorded in the CCT the same day it is worked. (*Id.*, §§119.7 and 119.7.1)

Plaintiffs did not indicate that they submitted the required paperwork to work overtime or receive compensation as required by this Policy.

**D.    Plaintiffs' allegations in the complaint and their affidavits.**

In their Complaint (Dkt. No. 16), Plaintiffs allege that they engaged in the following activities while off-duty at their homes:

a. Sanitizing and washing their uniforms, gear, belts and equipment, boots and shoes, and bags for necessary items, such as with Lysol, Clorox, or other chemicals and then washing their uniforms after each shift;

b. Sanitizing their vehicles with Lysol, Clorox, or other chemicals either before or after (or both) their shifts to avoid contamination within their vehicles present due to working in CCDOC;

c. Extensively showering and engaging in personal hygiene activity following their shifts; and,

d. Sanitizing and maintaining any PPE in their possession utilized in the course of their duties at CCDOC.

9

Second Amended Complaint, ¶21. Plaintiffs do not allege that they told a supervisor or even their Union representative that they were allegedly performing these tasks at home because of any alleged directive from the CCDOC.

In their motion for conditional certification, Plaintiffs merely state that the CCSO distributed to employees the "CDC and Illinois guidance on safety protocols for essential workers" during a pandemic, the same guidance that was issued and emphasized across the country to contain the spread of the virus. (Motion, p. 3) Not to minimize the realities of working in a Jail, there are countless jobs that involve interaction with the public or working in densely inhabited and/or congregate settings, such as shelters, public transportation systems, schools, grocery stores, senior living communities, and hospitals. Although Plaintiffs state that they engaged in "or were expected to engage in," "extensive personal hygiene activities consistent with CDC and Illinois protocols," Plaintiffs fail to point to a single directive issued by the CCDOC that required Plaintiffs to engage in any off-duty sanitization activities in their homes or personal vehicles. (Motion, pp. 3 and 8)

Six of the seven Plaintiffs submitted affidavits with their motion.[2] However, none of the six Plaintiff affiants refer to a single written policy or directive or even a verbal direction to engage in these alleged activities off duty. Instead, each provided identical generic statements as to being "aware of directives from Sheriff's staff directing officers to engage in personal hygiene and uniform and duty gear decontamination activities." (Dkt. No, 66-3 (Anderson, ¶ 7; Donis, ¶ 3; Evans, ¶ 7; Parnell, ¶ 7; Servant, ¶ 8; and Tinoco, ¶ 8)).

Most of the affiants identically claim that they have a "routine" when they arrived at home after a shift, that they clean their duty gear with various household cleaners, as well as their

---

[2] Rashid Muhammad did not submit an affidavit.

vehicles, and immediately wash their uniforms and "vigorously" shower. (Dkt. No. 66-3, Donis, ¶ 4; Evans, ¶ 7; Parnell, ¶ 9; Servant, ¶ 10; and Tinoco, ¶ 10) Others merely claim that they "consistently engaged in personal, uniform, vehicle, and duty gear decontamination activities before and after" their shifts without any further description of what those activities allegedly were, including what "duty gear" they are cleaning. (Dkt. No. 66-3, Anderson, ¶ 8; Evans, ¶ 8) They all inexplicably claim that they performed these activities after *and* then again before their shifts. (Dkt. No. 66-3, Anderson, ¶ 11; Donis, ¶ 5; Evans, ¶ 7; Parnell, ¶ 10; Servant, ¶ 11; and Tinoco, ¶ 11) Except for Parnell, the other five affiants attest that they each spend about 10 minutes on average before *and* after each shift for a total of 20-30 minutes combined per working day to allegedly perform the off duty "activities." (Dkt. No. 66-3 Anderson, ¶ 11; Donis, ¶ 5; Evans, ¶ 11; Servant, ¶ 11; and Tinoco, ¶ 11). Parnell claims it takes her a total of 45 minutes each working day. (Dkt. No. 66-3, Parnell, ¶ 10).

Moreover, Evans attests to the significant variances in what Correctional Officers allegedly do. Offering his alleged observations and inadmissible hearsay, Evans claims that some officers engage in "decontamination activities in LOT A before and after their shifts" and choosing to put on "extensive PPE in the parking lot," which Plaintiffs do not argue was required by the CCSO. Evans also allegedly overheard that another officer moved a washing machine into his garage to wash his uniform before going into the house or some officers keep cleaning products in their truck to clean their duty gear and car. (Evans, ¶¶ 9-10)

None of the Plaintiffs explained why they would have to wash and then rewash their uniforms or "sanitize" their "gear" or cars, both after and before each shift. Four Plaintiffs incredibly claim that they "did not engage in these activities" prior to the pandemic, which would include showering and washing their uniforms. (Dkt. No. 66-3, Donis, ¶ 4; Parnell, ¶ 9; Servant, ¶

11

10; and Tinoco, ¶ 10). For any additional sanitization efforts engaged in, Plaintiffs fail to establish that such efforts would not have been taken had they worked in any other job that involved direct interaction with other individuals. In addition, no Plaintiff attested to having to clean any "bags" or "PPE," while off duty, as alleged in the Complaint.

> **E. Plaintiffs cannot point to any CCSO issued common policy that violates the law.**

Here, Plaintiffs fail to point to any common policy or practice implemented by CCSO that violated the FLSA. Although Plaintiffs referenced the fact that the CCSO distributed CDC and Illinois pandemic guidance in daily emails and memoranda, Plaintiffs do not and cannot point to any directive to engage in extensive "sanitization" activities off duty after they arrived in their homes or before they were to return for the next shift. Instead, Plaintiffs' reference to the types of daily tips to prevent COVID-19 spread that the CCSO issued either were related to on duty activities or included the general CDC guidance available to the public at large. The daily tips were supportive messages designed to provide staff with helpful resources during a difficult, ever evolving pandemic. The daily tips were not directives, orders or policies, but included CDC guidance recommending the following:

- Wash hands with soap and water for at least 20 seconds, or use hand sanitizer;
- Avoid touching eyes, nose and mouth with unwashed hands;
- Physically distance from others as much as possible;
- Wear a face covering;
- Clean and disinfect frequently touched surfaces in homes and personal vehicles;[3] and
- Avoid sharing tools and equipment with others in the workplace.

---

[3] The CCDOC issued a directive specifically for cleaning duty vehicles used by employees on duty, but such activities were performed on the clock and had nothing to do with personal vehicles. Ex. 2, ¶ 9.

12

(Ex. 1, Group Ex. 1-A) The CCSO also circulated CDC guidance (again, the same guidance issued to the general public) with tips on how to keep safe while shopping, during food delivery, obtaining gasoline, and going to the doctors. (*Id.*)

As noted above, the CCSO expressly acknowledged how it could not dictate what officers did off duty in roll call notices issued for Correctional Officers stating that "[w]hile we cannot control what you do when you are not on duty, we recommend and hope that you will continue to practice social distancing and wear face masks when you are off duty and away from work." (Ex. 2, ¶ 5, Ex. 2-C)

None of these distributions directed correctional officers at the end and/or at the beginning of their work shifts to "vigorously" shower, nor are they instructed to regularly wash their uniforms (although the CCSO hopes that showering and regular washing of uniforms was already part of officers' regular personal hygiene practice). As noted above, the CCDOC issued a comprehensive COVID policy, which does not contain any requirements to perform "sanitization" activities at Correctional Officers' residences while off duty. Further, there are no directives relating to what Correctional Officers were to be doing with regard to their personal vehicles, although the CDC advised the general public to wipe down touch points in homes and cars.

    **F.**    **Conditional certification is not appropriate because individualized, fact-specific inquiries would need to be made.**

Plaintiff's FLSA claim should not proceed as a collective action on the additional basis that it requires individualized evidence and testimony from each potential collective action member to establish liability, to prove damages, if necessary, and for Defendants to establish their affirmative defenses. Conditional certification is not suitable in cases where the certification would result in the conducting of individualized determinations. *Forney v. TTX Co*., No. 05 C 6257, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (When the evidence relating to the plaintiffs and putative

collective action members is likely to be case-specific or subject to variables, conditional certification is not appropriate). Numerous courts have struck down requests for conditional certification in off-the-clock cases because, by their very nature, claims of working off-the-clock require courts to conduct individualized, fact-intensive analyses. *See Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 U.S. Dist. LEXIS 1772, at \*4-5 (N.D. Ill. Feb. 8, 2000) (certification of a collective action is not appropriate where court would be required to make fact-intensive, individualized determinations as to the nature of each putative class member's claim); *Saxton v. Title Max of Alabama, Inc*., 431 F.Supp.2d 1185, 1189 (N.D. Ala. May 4, 2006) (R. Proctor) (allegations that employer failed to compensate employees for overtime hours were, by their nature, highly case-specific, would require individualized analyses and, therefore, not suitable for class certification); and *Reich v. Homier Distrib. Co., Inc*., 362 F.Supp.2d 1009, 1013-14 (N.D. Ind. May 22, 2005) (W. Lee) (noting that many courts have declined to find potential class members similarly situated where liability depends on an individualized determination of each member's claim).

Here, Plaintiffs seek overtime compensation for claimed off duty activities they, and potentially 3000 plus other CCDOC employees, performed in their homes and personal vehicles, based on their highly personalized circumstances and individualized decisions. Plaintiffs' Motion and affidavits highlight some of those differences in what they and others were allegedly doing, which varied based on factors such as their work assignments on a particular day,[4] personal living situations, if they shared their personal vehicles with others, whether the individual had children,

---

[4] Plaintiffs also refer to working on the isolation and quarantine tiers. However, while working on these tiers, Correctional Officers were not providing medical or any other direct care to detainees. Moreover, as part of that assignment, Correctional Officers would be required to wear medical gowns over their uniforms, which would cover the uniform and duty belt. (Ex. 2, ¶ 7)

and the individual's level of personal concerns and caution, which would manifest differently from one potential class member to the next, in responding to the pandemic in their home environments and personal lives. (Motion, pp. 2-3; s*ee also* Dkt. No. 66-3, *generally* including Evans Aff., ¶¶ 9-10) Additional factors would include the vaccination and personal health status of the Correctional Officer as well as members of their household. Contrary to Plaintiffs' argument, the facts presented here are more closely in line with *Howard v. Cook County Sheriff's Office*, 989 F.3d 587 (7th Cir. 2021), in which the Court decertified a class of female Correctional Officers, because the individualized variations of how the alleged conduct impacted each potential class member undermined plaintiffs' ability to show that the case was appropriate for collective certification.

Furthermore, if the alleged putative collective action members allegedly worked off-the-clock, an individualized inquiry would need to be made as to whether Defendants should be liable if those employees actually worked overtime and failed to follow the proper procedure for being compensated for time worked. *Allen v. City of Chicago*, 865 F.3d 936 (7th Cir. 2017); *White v. Baptist Mem. Health Care Corp.*, 669 F.3d 869, 876 (6th Cir. Nov. 6, 2012) (Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.). If this Court grants Plaintiffs' Motion, the Court will be required to conduct individualized determinations as to why putative collective action members did not record their time worked and/or whether any supervisor was aware of the alleged at home off the clock work.

Lastly, even if a particular employee proved they performed off-the-clock work, the next level of analysis would involve whether the time was de minimis and, therefore, not compensable. Indeed, the alleged amount of time, if any, Plaintiffs and the potential class of over 3000

15

Correctional Officers allegedly spent off duty at home performing the claimed "sanitization" activities would most certainly vary depending on the various factors detailed above.

Similarly, the resolution of Defendants' affirmative defenses would also require individualized, fact-intensive analyses. The issues of not following proper timekeeping procedures along with Defendants' knowledge (or lack thereof) of the at-home off duty activities would require an individualized inquiry.

Given the fact-intensive, individualized determinations that will be required, certification will not serve any judicial economy. Therefore, for all of the above stated reasons, Plaintiffs' motion for conditional certification should be denied.

### III. PLAINTIFFS PRESENTED NO EVIDENCE TO SUPPORT INCLUDING THE INVESTIGATOR II POSITION IN ANY CLASS.

None of the Plaintiffs hold the position of Investigator II. No affidavits were submitted by any Sheriff's Office employee holding the position of Investigator II. The only information provided about Investigator IIs comes from two Plaintiffs, Correctional Officers Monta Servant and Joseph Tinoco, who attest that Investigator IIs are subject to the same directives as Correctional Officers. (Servant and Tinoco Aff. at ¶ 3) Both of these Plaintiffs claim that they personally observed Investigators in close contact with detainees and that they transport detainees while on duty. (*Id.*) However, neither provide any information as to whether Investigator IIs allegedly perform the same activities at home, off duty, as claimed by Plaintiffs in this lawsuit.

Without such evidence, there is no basis to include Investigator IIs in any collective action.

### IV. PLAINTIFFS' PROPOSED NOTICE OF RIGHT TO OPT-IN IS DEFECTIVE.

To the extent that this Court finds that a collective action should be conditionally certified, Defendants raise the following objections to Plaintiffs' proposed notice. First, as fully discussed

16

above, the Investigator II position should not be included in any certified class as Plaintiffs presented no evidence as to what activities, if any, Investigator IIs allegedly performed off duty.

Second, Plaintiffs have presented no evidence as to why the class should date back to January 27, 2020. Although they claim there were written directives in place, no such directives were submitted with their motion, nor did any Plaintiff indicate the date upon which they first were allegedly instructed to do anything regarding claimed off duty activities.

Third, Defendants object to the use of the term "decontamination," which has a certain meaning within a work environment. This is not a case such as *Steiner v. Mitchell*, 350 U.S. 247 (1956), in which the employees are working with toxic chemicals and are required to change clothes and shower prior to even leaving the worksite. Here, Plaintiffs allege that they leave the Jail in their uniforms and allegedly perform the claimed activities in their own homes. Plaintiffs do not even assert that they are instructed to go directly home after a shift to perform these activities. In fact, as we all know, the pandemic was and still is a world-wide reality and certainly was not originated in or contained to the inside of the Jail.

Fourth, Defendants object to the sentence in the third bullet point stating "[t]here is currently no money available, nor is there a guarantee that money will become available," as being misleading and not necessary to the notice. Fifth, in the next sentence, "your legal rights are affected" should be corrected to "your legal rights may be affected."

Sixth, in the numbered paragraph 1, Defendants object to the language that states "Become a part of this lawsuit and await the outcome," as being misleading and not conveying the import of opting into the lawsuit. Defendants suggest that the language read "Become a part of this lawsuit by opting in as a plaintiff and you will be bound by any settlement and/or decisions in the case."

Similar language should be added to paragraph 2. Defendants suggest inserting the following phrase after "part of the lawsuit,": ", will not be bound by any potential settlement or decision,".

Seventh, the notice should contain the full court caption in addition to the following language in bold at the end of the notice:

> THIS NOTICE AND ITS CONTENT HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, THE HONORABLE JUDGE REBECCA R. PALLMEYER. THE COURT HAS MADE NO DECISION ABOUT THE MERTIS OF PLAINTIFFS' CLAIMS OR DEFENDANTS' DEFENSES.

The Notice should also instruct individuals not to contact the Court for any information.

Lastly, the opt-in consent form is also very confusing and assumes that the person engaged in the vaguely described activities. The form should be rewritten so that the individual is attesting that they actually engaged in the claimed activities as identified in the complaint and the time period in which they claim they engaged in such activities. Further, the form should request a date when the form is signed. The consent form should repeat the date that it must be submitted to ensure the individual is aware of the deadline.

## V.   CONCLUSION

Wherefore, for the reasons stated herein along with the evidentiary submissions, Defendants respectfully request that this Court deny Plaintiffs' Motion for conditional certification of a collective action of their FLSA claims.

18

Dated: November 10, 2021      **THOMAS J. DART, SHERIFF OF COOK COUNTY, AND COUNTY OF COOK, ILLINOIS**

By: /s/Jennifer A. Naber
One of Their Attorneys

Jennifer A. Naber
Matthew P. Kellam
Laner Muchin, Ltd.
515 N. State Street, Suite 2800
Chicago, Illinois 60654
Phone: (312) 467-9800
jnaber@lanermuchin.com
mkellam@lanermuchin.com

## CERTIFICATE OF SERVICE

Jennifer A. Naber, an attorney, certifies that she caused the foregoing **Defendants Sheriff Dart's and Cook County's Response in Opposition to Conditional Collective Action Certification** to be served on the parties below, the Court's ECF filing system, on this 10th day of November 2021, addressed to:

Cass T. Casper
Gianna R. Scatchell
Disparti Law Group, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, IL 60601
(312) 506-5511
ccasper@dispartilaw.com
gia@dispartilaw.com

Jacie C. Zolna
Myron M. Cherry & Associates
30 North LaSalle Street
Suite 2300
Chicago, IL 60602
(312) 372-2100
jzolna@cherry-law.com

John T. Lanahan
Law Office Of John Lanahan
188 West Randolph
Suite 702
Chicago, IL 60601
(312) 404-2416
lanahan.john@gmail.com

Richard F. Linden
Law Offices of Richard Linden
17 North State, Suite 1550
Chicago, IL 60602
312 590 0211
lindenlaw@gmail.com

Attorneys for Plaintiffs

/s/Jennifer A. Naber