UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID EVANS III, RASHID MUHAMMAD, MONTA SERVANT, FELISHA PARNELL, DWIGHT ANDERSON, JOSEPH TINOCO, and FRANK DONIS,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS J. DART, Sheriff of Cook County, COOK COUNTY OF COOK, a unit of local government as joint employer for FLSA purposes and as indemnitor,<br><br>Defendants. | No. 20 C 2453<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs David Evans III, Rashid Muhammad, Monta Servant, Felisha Parnell, Dwight Anderson, Joseph Tinoco, and Frank Donis worked as Correctional Officers for Defendants Cook County, Illinois, and Thomas J. Dart, the Sheriff of Cook County. Plaintiffs allege that Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to pay them and other similarly situated employees for overtime work. Plaintiffs now move for conditional class certification and court-authorized notice under the FLSA [66]. As explained here, that motion is denied without prejudice.

## BACKGROUND

The Cook County Department of Corrections ("CCDOC") has been at the epicenter of the nation's fight against the spread of COVID-19. In April 2020, the jail was "the nation's largest-known source of coronavirus infections." *See* https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last visited Mar. 18, 2022). The CCDOC took swift action, and by July 2020, the Centers for Disease Control ("CDC") found that the jail's aggressive intervention strategies had mitigated transmission and caused a decline in cases. *See* https://www.cookcountysheriff.org/cdc-study-finds-aggressive-timely-interventions-dramatically-

reduced-covid-19-case-at-cook-county-jail (last visited Mar. 18, 2022). This case concerns allegations that those intervention strategies required officers at the CCDOC to perform unpaid labor in violation of the FLSA.

I.      **Plaintiffs' Allegations and Declarations**

Plaintiffs filed this putative collective action on April 21, 2020. (Compl. [1].) In Counts 1 and 2 of their Second Amended Complaint, Plaintiffs allege that Defendants failed to adequately compensate them, and other employees similarly situated, in violation of the FLSA. (Second Am. Compl. (hereinafter "SAC") [16] ¶¶ 62-71.) Plaintiffs contend that when the COVID-19 pandemic began, Sheriff Dart required them to "engag[e] in decontamination/sanitation activities after the end of their shifts within the CCDOC, including washing and sanitizing their uniforms, sanitizing their persons, sanitizing and maintaining personal protective equipment ("PPE"), and showering." (*Id.* ¶¶ 20, 43.) Plaintiffs allege these activities took "approximately 20 to 30 minutes at the beginning and/or end of each shift" (*id.* ¶¶ 45-51), and that "[a]t no time have the Defendants paid Plaintiffs or similarly situated officers for the aforementioned activities." (*Id.* ¶ 44.) Plaintiffs also allege these activities were undertaken in addition to full workdays, often "up to sixteen (16) hours straight inside the CCDOC." (*Id.* ¶¶ 32-33.) Plaintiffs propose the following class definition:

> All persons who worked, for any portion of time, as a Cook County Correctional Officer (CO1) or Investigator II (CS2) at the Cook County Department of Corrections between January 27, 2020 and June 11, 2021 and who engaged in washing, sanitizing, or decontaminating activities as to their person, uniform, duty belt, personal protective equipment, or vehicles used in commuting to and from work, and who were not paid for time spent contiguously before or contiguously after their shifts engaging in such activities.

(Pls.' Mot. to Certify Class (hereinafter "Mot.") [66] at 3.) Plaintiffs allege the class may include up to 3000 employees, as that is roughly the number of Correctional Officers and Investigator II's employed by CCDOC during the relevant time period. (*Id.* at 2 & n.1.)

In support of their motion for conditional certification and court-authorized notice, Plaintiffs have submitted declarations from named Plaintiffs Anderson, Donis, Evans, Parnell, Servant, and Tinoco, each of whom worked as a Correctional Officer at the CCDOC during the time period in

2

the class definition. (Pls.' Decls., Ex. 3 to Mot. (hereinafter "Pls.' Decls.") [66-3] at 1, 4, 6, 9, 12, 15.) The declarants worked in five different positions or locations: Anderson "was bidded to Cermak Hospital" (*id.* at 1), Donis "was assigned to Support Staff" (*id.* at 4), Evans and Tinoco were assigned to the "External Operations" Unit (*id.* at 6, 15), Parnell "was bidded to Receiving" (*id.* at 9), and Servant "was assigned to Division 5." (*Id.* at 12.) Anderson, Evans, Parnell, Servant, and Tinoco all declare that they were required to work overtime and that they believe "every officer at the CCDOC has been mandated to work overtime." (*Id.* at 1, 2, 7, 10, 11, 12, 13, 15, 16.)

Each officer also avers that they were subject to directives from the Sheriff's Office to clean, disinfect, and decontaminate themselves and their gear before and/or after their normal workday. Anderson declares he "engaged in personal, uniform, vehicle, and duty gear decontamination activities before and after [his] shift as required by the Sheriff throughout 2020 and 2021." (*Id.* at 2.) Donis, Parnell, Servant, and Tinoco each declare that after arriving home from their shifts, they engaged in a routine of cleaning their duty gear and vehicle with household cleaners, and then immediately washed their clothes and vigorously showered, and that they did not engage in these activities prior to the COVID-19 directives from the Sheriff's Office. (*Id.* at 4, 10, 13, 16-17.) Evans declares that, in addition to his own decontamination activities "as required by the Sheriff throughout 2020 and 2021," he "also personally observed others engaging in extensive decontamination activities in [Lot] A before and after their shifts, and in some cases [he saw] officers don extensive PPE in the parking lot before going into the compound to start work." (*Id.* at 7.) Evans declares he

> also overheard officers with small children or sick family members at home discuss, for example, in one instance, move a washing machine into the garage at home in order to specifically remove and wash their uniform before going into their house, and officers who keep cleaning supplies and decontamination products in their vehicles or garages in order to wipe down their duty gear and vehicle after their shifts.

3

(*Id.* at 7-8.) Each declarant avers he or she was not "paid wages (minimum or overtime) for engaging in the decontamination activities described here and in the complaint," and that "to [their] knowledge, no officer was so paid." (*Id.* at 3, 5, 8, 11, 14, 17.)

All named Plaintiffs and declarants worked as Correctional Officers; none worked as an "Investigator II," the other job title included in the proposed class definition. Plaintiffs' motion for conditional certification states that "Investigators work in the Electronic Monitoring Unit at the CCDOC and are subject to the same overarching General Orders and policies of the Sheriff as the Correctional Officers." (SAC at 2 n.1.) Plaintiffs allege further that "for purposes of this suit Correctional Officers and Investigator II's are similarly-situated." (*Id.*) Declarants Servant and Tinoco aver that they "personally observed" Investigator II's working in the presence of detainees, and they also declare that Investigator II's are subject to the same decontamination protocols and expectations as Correctional Officers. (Pls.' Decls. at 12, 15.)

## II.    Defendants' Declarations

### A.    Brad Curry, Cook County Sheriff's Office Chief of Staff

In response to this motion, Defendants have submitted three declarations relevant to class certification, as well as numerous exhibits.[1] The first such declaration is from Brad Curry, who was, during the relevant period, Chief of Staff for the Cook County Sherriff's Office ("CCSO"). In that capacity, Curry oversaw "all CCSO efforts to address, combat and limit the spread" of COVID-19 within CCDOC. (Decl. of Brad Curry, Ex. 1 to Resp. (hereinafter "Curry Decl.") [90-1] ¶¶ 1, 2.) Curry states that in February and March 2020, CCSO "began making specific modifications to existing procedures to directly address the threat of COVID-19." (*Id.* ¶ 10.) When the crisis began, CCSO adopted an "operations plan" that put "procedures, directives and orders . . . into effect throughout the Jail and other departments." (*Id.* ¶ 11.) Since March 10, 2020, Curry declares, he has "authorized a daily message to all staff regarding a wide variety of pandemic

---

[1] A fourth declaration, by Cook County Sheriff's Office Labor Counsel Peter Kramer, is not cited or discussed by any party and does not appear relevant to conditional certification.

4

related issues," including "helpful data, information on keeping safe, PPE guidance, procedural changes and reporting pathways." (*Id.* ¶ 23.) Further, Curry is "critically aware of the fear and apprehension inherent in this pandemic amongst [CCSO] staff." (*Id.* ¶ 24.) But "[t]hrough a combination of clear processes, procedures, instruction, daily encouragement, communication and easy reporting structures, [CCSO] sought to alleviate fear and apprehension in all people involved in the Jail." (*Id.*) Curry also ensured that "[d]istribution of supplies and compliance with CDC guidelines regarding use of PPE and cleaning supplies" was "monitored by sanitation officers and superintendents in each Division of the jail." (*Id.* ¶ 26.)

Several exhibits are attached to Curry's declaration. Though Defendant makes little specific mention of them, Plaintiffs contend that those exhibits bolster their claim that CCSO required the proposed class to engage in the activities alleged in this case. (*See* Reply [95] at 2-3.) Plaintiffs specifically highlight the following exhibits—which, from the court's review, appear to be reminders of basic public health measures. Thus, on March 4, 2020, Curry sent an email to CCSO employees, in which he stated that "as a reminder, CDC always recommends everyday preventive actions to help prevent the spread of respiratory diseases," including by "[c]lean[ing] and disinfect[ing] frequently touched objects and surfaces using a regular household cleaning spray or wipe." (Exs. to Curry Decl. (hereinafter "Curry Exs.") [90-1] at 11.) An email to employees on March 15 asked employees to "[r]emember the simple steps to keep yourself and others safe," which include "[c]lean[ing] AND disinfect[ing] frequently touched surfaces daily." (*Id.* at 20-21.) An email to employees on March 18 included the following: "Please remember to take care of yourself. It is always a good time to remind ourselves of important daily practices which do help prevent the spread of COVID-19." (*Id.* at 25.) In that email, Curry noted that the CDC and the White House issued "a simple instruction sheet for slowing the spread of COVID-19," which he attached for employees to review. (*Id.* at 26.) Among the guidelines in that attachment—titled "15 Days to Slow the Spread"—was to "Practice Good Hygiene," including by "[d]isinfect[ing] frequently used items and surfaces as much as possible." (*Id.* at 27.) In a March 22, 2020 email,

5

Curry included a "Public Health Tip of the Day" after his signature. The tip: "To help prevent the spread of COVID-19, it is critical to clean and disinfect frequently touched surfaces and objects. Keep yourself, your family and your coworkers healthy by wiping down surfaces at both work and at home." (*Id.* at 51.)

### B. Hugh Walsh, CCSO First Assistant Executive

Defendants' second declaration is from Hugh Walsh, the CCSO First Assistant Executive Director, who manages and supervises the operations of CCDOC. (Decl. of Hugh Walsh, Ex. 2 to Resp. (hereinafter "Walsh Decl.") [90-2][2] ¶¶ 1-2.) Walsh attached to his declaration "the section of the CCDOC June 2020 policy manual with directives developed and implemented specific to the COVID-19 pandemic and applicable to Correctional Officers." (*Id.* ¶ 3.) Walsh asserts that "[n]one of these directives require that Correctional Officers engage in sanitization activities while off duty." (*Id.*)

The exhibit titled "Workplace Guidelines During [the] COVID-19 Pandemic" states that "[t]he purpose of this policy is to establish clear and uniform workplace safety guidelines for members of the [CCSO] during the COVID-19 pandemic." (Walsh Exs. [85-3] at 34.) Section 1605.2 of the Guidelines is titled "Policy," and states:

> Members of the Sheriff's Office shall adhere to local and state guidelines, and applicable policies and procedures, regarding best practices to help protect against the spread of COVID-19.
>
> The Sheriff's Office shall send out communications on a regular basis . . . to address best safety practices for members while in the workplace. In addition, physical signage will be posted throughout Sheriff's Office facilities and workspaces to reinforce best safety practices.
>
> Members who fail to adhere to this policy, state and local guidelines, Sheriff's Office policies/procedures related to COVID-19 and other COVID-19-related mandates may be subject to discipline.

---

[2] At [90-2] in the record, Defendants include the Walsh Declaration along with a corrected Exhibit 2-A; the other Walsh exhibits are not attached. For that reason, the court refers to [90-2] for Walsh's declaration and the corrected Exhibit 2-A, and refers to [85-3] for Exhibits 2-B, 2-C, and 2-D.

6

(*Id.* at 35.) Section 1605.3, "General Guidelines," states:

> To aid in the prevention of the spread of COVID-19, members shall:
> . . . .
> (g)   Clean and disinfect workspaces, frequently touched workplaces [sic] surfaces before and after use and areas within a member's home.

(*Id.* at 35-36.) Finally, Section 1605.7.2, "Wearing Personal Protective Equipment," states:

> If a member is issued a durable type of PPE (e.g., cloth face covering, safety goggles, face shield), they are responsible for its proper use and upkeep. Members should comply with guidelines to properly put PPE on and take it off.

(*Id.* at 39.)

The court also notes another exhibit Walsh attached to his declaration, which Defendants contend supports their position that they "could not dictate what officers did off duty." (Resp. at 13.). Specifically, in a July 2, 2020 email to all CCDOC staff, Jane Gubser, Executive Director of Programs, stated:

> [A]ll staff are required to wear face masks while on the CCDOC compound and while working at the external posts. . . . While we cannot control what you do when you are not on duty, we recommend and hope that you will continue to practice social distancing and wear face masks when you are off duty and away from work.

(Walsh Exs. at 14.)

### C.   Matthew Burke, Executive Director of Human Resources

Defendants' third declaration is from Matthew Burke, the Executive Director of Human Resources. (Decl. of Matthew Burke, Ex. 3 to Resp. (hereinafter "Burke Decl.") [90-3] at 1.) Burke declares that his responsibilities include, among other things, "keeping abreast of continuously developing guidance issued by public health agencies." (*Id.* ¶ 4.) Burke attached to his declaration a March 19, 2020 memorandum to all CCDOC staff from Gubser and Michael Miller, Executive Director of Operations. (Exs. to Burke Decl. (hereinafter "Burke Exs.") [90-3] at 11.) The subject of the memorandum is CCDOC staff screening, but it also includes the following sentence: "Please continue to practice everyday preventive actions to reduce the spread of contagious diseases, including staying home if you are not feeling well, using proper handwashing

7

technique, avoiding touching your face, and disinfecting frequently used items or surfaces as much as possible." (*Id.*)

## **DISCUSSION**

Under the FLSA, covered employers must pay covered employees a minimum wage for all hours worked and "one and one-half times the regular rate" of pay for all hours worked over forty in one workweek. 29 U.S.C. §§ 206, 207. While activities that "are preliminary to or postliminary to" an employee's "principal activity or activities" are generally not compensable, 29 U.S.C. § 254(a), they may be compensable if they are "an integral and indispensable part of the principal activity of the employment." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956) (holding that changing clothes and showering were compensable activities for employees working at a plant with hazardous chemicals); *cf. Chagoya v. City of Chicago*, 992 F.3d 607, 623 (7th Cir. 2021) (holding that the time it takes SWAT operators to transport, unload, and safely store work equipment in their homes was "not integral and indispensable, but rather preliminary and postliminary," and thus not compensable). The Supreme Court in *Steiner* noted that "changing clothes and showering under normal conditions" is generally not compensable. *Id.* at 332; *see also* 29 C.F.R. § 790.7(g) ("[o]ther types of activities which . . . would be considered 'preliminary' or 'postliminary' activities, include . . . changing clothes, washing up or showering."); *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 208-09 (7th Cir. 2008) (holding that a postal worker's time spent putting on and removing her gloves, shoes, and work shirt was not compensable under the FLSA). Plaintiffs allege that their sanitization activities—which they claim Defendants required—were not undertaken under the "normal conditions" noted in *Steiner*, and thus should be compensable under the FLSA. (SAC ¶¶ 22-23.)

In the event that an employer fails to pay sufficient wages to its employees, the FLSA allows employees to bring a collective action on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b); *see Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010). Collective actions are somewhat similar to class actions under Federal Rule of Civil

Procedure 23, though members of an FLSA collective action "must opt into the suit to be bound by the judgment or settlement in it, while in a class action governed by Rule 23(b)(3) (a class action seeking damages) they must opt out *not* to be bound." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013). To opt into an FLSA collective action, prospective plaintiffs must file a written consent to join the suit. *See Alvarez*, 605 F.3d at 448. In light of that requirement, district courts can grant plaintiffs permission "to send notice to potential class members, prior to discovery, to advise them of the lawsuit's existence, their right to join the suit and how to do so." *Shiner v. Select Comfort Corp.*, No 09 C 2630, 2009 WL 4884166, at *2 (N.D. Ill. Dec. 9, 2009). District courts have broad discretion to manage the opt-in process. *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1046-47 (7th Cir. 2020) (citing *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170-71 (1989)); *see Alvarez*, 605 F.3d at 449 ("A district court has wide discretion to manage collective actions.").

"Neither Congress nor the Seventh Circuit has specified the procedure courts should use to decide FLSA certification and notice issues, but collective FLSA actions in this district generally proceed under a two-step process." *Nicks v. Koch Meat Co., Inc.*, 265 F. Supp. 3d 841, 848 (N.D. Ill. 2017) (internal quotation marks omitted). This case is at step one, the conditional certification stage, in which the court "determine[s] the size and contour of the group of employees who may become collective members and whether these potential members are 'similarly situated.'" *Id.* (citing 7B Charles A. Wright et al., Federal Practice & Procedure § 1807). At step one, the plaintiffs must show that the other potential plaintiffs are "similarly situated" by making a "modest factual showing sufficient to demonstrate that they and [the other] potential plaintiffs together were victims of a common policy or plan that violated the law." *Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 870 (N.D. Ill. 2017). At this first step, "the court does not resolve factual disputes or decide substantive issues going to the merits." *Larsen v. Clearchoice Mobility, Inc.*, No. 11 C 1701, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011). Still, "conditional certification is not automatic." *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15-CV-10447, 2016 WL 1043429, at *2

9

(N.D. Ill. Mar. 16, 2016). Plaintiffs must provide factual support for their allegations "in the form of affidavits, declarations, deposition testimony, or other documents." *Anyere v. Wells Fargo Co.*, No. 09 C 2769, 2010 WL 1542180, at *2 (N.D. Ill. Apr. 12, 2010).

I. **Conditional Certification**

Plaintiffs argue that they have made the necessary modest factual showing that they and other potential plaintiffs are similarly situated, because they all hold one of two job titles, they all are subject to the same general orders, they all work on or around the CCDOC compound, and they "all were subjected to the work requirement of engaging in heightened COVID-19 decontamination activities alleged in the complaint." (Mot. at 7.) Defendants counter that the court should deny Plaintiffs' motion because (1) Plaintiffs have not identified a common policy that violates the FLSA, (2) the case will involve individualized, fact-specific inquiries, and (3) Plaintiffs have not established that Investigator II's are similarly situated to Correctional Officers. (Resp. at 7-16.) The court addresses Defendants' arguments in turn.

A. **Common policy**

Defendants argue, first, that Plaintiffs have failed to provide sufficient evidence of a common policy or practice that violates the FLSA. Specifically, Defendants argue that "Plaintiffs do not and cannot point to any directive to engage in extensive 'sanitization' activities off duty after they arrived in their homes or before they were to return for the next shift." (Resp. at 12.) Defendants characterize the evidence cited by Plaintiffs as "tips" sent by CCSO that "either were related to on[-]duty activities or included the general CDC guidance available to the public at large." (*Id.*) Defendants further argue these "were supportive messages designed to provide staff with helpful resources during a difficult, ever evolving pandemic," and thus they "were not directives, orders or policies." (*Id.*) In addition, Defendants argue, they "could not dictate what officers did off duty," noting the July 2, 2020 email from Gubser stating as much. (*Id.* at 13 (citing Walsh Exs. at 14).)

10

The court agrees. Plaintiffs characterize language that appears in Defendants' exhibits as evidence of the "directives" Plaintiffs allude to in their complaint and declarations. (*See* Reply at 2-5.) The court is unable to understand the emails and memoranda noted above as forming a policy that required Correctional Officers to engage in the off-duty sanitization activities alleged. Curry's March 4, 2020 email provided the officers with a "reminder" of what the CDC "recommends." (Curry Exs. at 11.) Curry's March 15 and March 18 emails asked the officers to "remember" various safety tips. (*Id.* at 20-25.) The memorandum from Gubser and Miller asked the officers to "[p]lease continue to practice everyday preventive actions." (Burke Exs. at 11.) These communications are not evidence of a policy requiring particular pre- or post-shift actvities; there is no evidence that Correctional Officers were *required* to follow these precautionary tips.

Plaintiffs respond by arguing that "the Sheriff adopted these [communications] as their official policy." (Reply at 3.) Plaintiffs cite Section 1605.2 of the "Workplace Guidelines During [the] COVID-19 Pandemic," which states that the officers "shall adhere to local and state guidelines, and applicable policies and procedures, regarding best practices to help protect against the spread of COVID-19." (Walsh Exs. at 35.) The next sentence of the policy states that "[t]he Sheriff's Office shall send out communications . . . to address best safety practices for members while in the workplace." (*Id.*) And the policy states that "[m]embers who fail to adhere . . . may be subject to discipline." (*Id.*)

Even if the court were to conclude that Defendants' Workplace Guidelines policy made the health suggestions in the emails and memoranda noted above a *requirement* for employees (with the threat of discipline), that conclusion would not support certifying a class as defined by Plaintiffs.[3] None of the communications cited by Plaintiffs require Correctional Officers to

---

[3] One problem with finding that the Workplace Guidelines imbued the tips in Defendants' emails with the force of official policy is that the Guidelines exhibit is dated June 2020, whereas the emails that Plaintiffs cite all date to March 2020. Thus, it is not clear that the Workplace Guidelines were in effect at the time the Sheriff's Office sent emails to employees with various health tips and suggestions.

11

"engage[ ] in washing, sanitizing, or decontaminating activities as to their person, uniform, duty belt, personal protective equipment, or vehicles . . . contiguously before or contiguously after their shifts." (*See* Mot. at 3.) While some of the communications did state that the officers may want to sanitize frequently-touched surfaces "daily" (*See* Curry Exs. at 21, 25), they did not state that such activities must be completed outside the workplace, or before or after regular work hours. To the contrary, the Sheriff's Office COVID policy states that it will "send out communications" to "address best safety practices for members *while in the workplace*."[4] (Walsh Exs. at 35 (emphasis added).) Plaintiffs point to Curry's March 22, 2020 email, which included a "Tip of the Day" to "[k]eep yourself, your family and your coworkers healthy by wiping down surfaces . . . at home." (Curry Exs. at 51.) That tip does not address best *workplace* safety practices, so it is not at all clear that it is covered by the Sheriff's Office COVID policy. In any event, the tip applies to "surfaces . . . at home," not to Plaintiffs' bodies, uniforms, duty belts, PPE, or vehicles. (*See id.*) Thus, even if the tip is considered part of the Sheriff's policy, it does not support Plaintiffs' allegations or establish that the activities Plaintiffs engaged in to sanitize their uniforms, for example, were job duties.

The same shortcomings apply to the specific guidelines within the policy. Section 1605.3 states that "members shall . . . [c]lean and disinfect workspaces, frequently touched workplaces [sic] surfaces before and after use and areas within a member's home." (Walsh Exs. at 35-36.) Notably, the items that the declarants allegedly sanitized do not appear to include "workspaces," "workplace[ ] surfaces," or "areas within a member's home." Section 1605.7.2 states that a member who is "issued a durable type of PPE" is "responsible for its proper use and upkeep." (*Id.* at 39.) Plaintiffs offer no basis for the assumption that proper upkeep includes intensive sanitization before or after an employee's shift. There is no indication in this record that

---

[4] The court also acknowledges Gubser's July 2, 2020 email, in which she states that CCSO "cannot control what you do when you are not on duty," as further evidence that Defendants' policies applied only to on-the-clock work. (Walsh Exs. at 14.)

12

supervisors expected or were even aware of such activity, or that they made any effort to confirm that it was carried out. In sum, Plaintiffs have not shown that Defendants have a policy that requires CCSO employees to engage in the alleged sanitization activities before or after their shifts.

Plaintiffs alternatively argue that whether the Sheriff's health guidelines and tips "carry the weight of official policy is an issue that is common to all claimants that can and should be decided in a single collective proceeding." (Reply at 4.) As noted above, however, the health guidelines and tips—even if they carry the weight of official policy—do not require the sanitization activities Plaintiffs allege. Plaintiffs nevertheless argue that their "declarations are sufficient" (Reply at 4), and as support they cite *Nicks*, which notes that "several courts in this District have conditionally certified a collective action where multiple employees provided affidavits declaring that they consistently worked overtime without being compensated, even if the plaintiffs did not identify a specific, written policy requiring unpaid overtime work." *Nicks*, 265 F. Supp. 3d at 851.

Neither *Nicks* nor the caselaw it considers support conditional certification here. In *Nicks*, plaintiffs were employed by the defendants to "catch and cage" chickens that had grown large enough to be sold as poultry products for human consumption. *Nicks*, 265 F. Supp. at 845. The plaintiffs alleged they were paid "per 1,000 chickens caught," and that Defendants did not compensate them for working in excess of 40 hours per week. *Id.* at 848. While the plaintiffs did not identify "a specific, written policy requiring them to work overtime," they did establish that the defendants "had a de facto practice . . . of not paying for overtime hours." *Id.* at 853. The plaintiffs did so by "produc[ing] specific evidence that Defendants set the daily chicken catching schedules, determined when and how many chickens to put in each cage on each load, and employed [supervisors] who oversee the transportation of the chickens from the farm to the Defendants' processing plant." *Id.* Here, while Plaintiffs' declarations refer generally to "directives from Sheriff's staff" (*see, e.g.*, Pls.' Decls. at 2), the only such "directives" that Plaintiffs actually identify do not appear to require off-duty sanitization activities. And unlike in *Nicks*, Plaintiffs here do not

allege a de facto policy. They do not, for example, allege that CCSO supervisors checked to see if officers had sanitized their uniforms and gear, or allege that supervisors required officers to certify that they had extensively showered.

The cases discussed in *Nicks* are similarly distinguishable. For example, the court in *Madden v. Corinthian Colleges, Inc.*, No. 08 C 6623, 2009 WL 4757269, at *2 (N.D. Ill. Dec. 8, 2009) found that "[c]ourts in this district regularly allow Plaintiffs to pursue collective actions under the FLSA where they allege that an employer has an unwritten policy requiring its employees to perform uncompensated work 'off the clock.'" Plaintiffs here do not allege they were subject to an unwritten policy; they argue that the Sheriff's emails, memoranda, and Workplace Guidelines are policies requiring the sanitization activities they allegedly performed. The court in *Anyere v. Wells Fargo Co.*, No. 09 C 2769, 2010 WL 1542180, at *2 (N.D. Ill. Apr. 12, 2010) found that the defendant had a de facto policy requiring its employees to log only 40 hours per week and not submit overtime hours for compensation. The court in *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 937-38 (N.D. Ill. 2008) found sufficient evidence of a de facto policy in violation of the FLSA where the employees testified that the supervisors were aware they were working overtime—and expected them to do so—without compensation. Again, in each of these cases, the plaintiffs alleged a de facto policy. Plaintiffs, here, have not provided a citation to any case in which the court granted conditional certification despite the lack of either a written or unwritten policy, or of any evidence that supervisors knew of or required off-duty efforts.

Plaintiffs also claim they "cited caselaw [in their motion] finding, under similar circumstances, that conditional certification is appropriate." (Reply at 1.) Plaintiffs' motion, however, does not address the common policy issue in any depth; rather, Plaintiffs there focus almost exclusively on the issue of whether they and potential claimants are "similarly situated." (*See* Mot. at 3-10.) Plaintiffs may be referring to *Boltinghouse v. Abbott Lab'ys, Inc.*, 196 F. Supp. 3d 838 (N.D. Ill. 2016), which they cite in their motion as support for the contention that "six declarations offered by plaintiffs" are "sufficient to justify conditional certification status." (Mot. at

14

9-10.) In *Boltinghouse*, the plaintiffs alleged the defendant "misclassified them and all other individuals who were employed by Defendant as [exempt] field service specialists, denying them overtime compensation in violation of the FLSA." *Boltinghouse*, 196 F. Supp. 3d at 839. The defendant's common policy—denying exempt workers overtime compensation—was not contested by the parties. The issue, instead, was whether the plaintiffs' declarations sufficed as evidence that they were in fact misclassified as exempt workers, together with all others similarly situated; the court found the declarations were sufficient. *Id.* at 842-43. As discussed below, the court applies a similarly lenient standard as in *Boltinghouse* on the question of whether Plaintiffs' declarations suffice to show they are similarly situated to their proposed class. But the reasoning in *Boltinghouse* cannot remedy the failure by Plaintiffs to establish that they were subject to a common policy to engage in pre- and post-work sanitization activities.

As Plaintiffs have not shown that they are "victims of a common policy or plan that violated the law," *Grosscup*, 261 F. Supp. at 870, the court will not certify the class as currently proposed. Plaintiffs' motion is therefore denied. While, for that reason, it is not necessary to reach Defendants' other arguments, the court considers them briefly below.

### B. Individualized, fact-specific issues

Defendant's argument that Plaintiff's FLSA claims "require[ ] individualized evidence and testimony from each potential collective action member" (Resp. at 13) is not appropriately raised at the conditional certification stage: "in this district, courts agree that concerns regarding . . . the need for individualized inquiries should be raised at step two, not step one." *Boltinghouse*, 196 F. Supp. 3d at 842 (internal quotation marks omitted) (citations omitted). *Forney v. TTX Co.*, No. 05 C 6257, 2006 WL 1030194 at *3 (N.D. Ill. Apr. 17, 2006), cited by Defendants, does not hold that when evidence "is likely to be case-specific or subject to variables, conditional certification is not appropriate." (Resp. at 13-14.) The *Forney* court did state that "individualized determinations" may make certification inappropriate, but the court made that statement only after "assuming [Plaintiff] passes step one." *Forney*, 2006 WL 1030194, at *3.

15

In *Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000), the court denied conditional certification because liability turned on individual determinations of whether plaintiffs were "independent contractors" or "employees" within the meaning of the FLSA—a matter not at issue here. *Pfaahler*, 2000 WL 198888, at *2. And unlike the plaintiff in *Pfaahler,* Plaintiffs here have made a modest factual showing that they are similarly situated to other potential plaintiffs.[5]

Defendants may well be correct that individualized, fact-specific issues would predominate in this case, but such a defense is more appropriately considered at step two of certification. *See Jirak v. Abbott Lab'ys, Inc.*, 566 F. Supp. 2d 845, 850 (N.D. Ill. 2008) ("The mere potential that individual issues may predominate after further discovery does not preclude conditional certification of the class."). That conclusion is not altered by the Seventh Circuit's recent decision in *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587 (7th Cir. 2021), where a proposed class of female employees at Cook County Jail alleged an "epidemic" of sexual harassment in violation of their civil rights. *Howard*, 989 F.3d at 592-94. The Seventh Circuit reversed the district court's order certifying a Rule 23 class in part because "significant variation in harassment levels across different parts of the jail complex renders certain class members' work environments materially different from those of others." *Id.* at 598. But *Howard* involved certification under Rule 23, which is not analogous to step one of an FLSA collective action. If Plaintiff in this case could show they were subject to an unlawful overtime work policy, their claims may be less fact-intensive than the inquiry into the severity and pervasiveness of a particular employee's experience of sexual harassment. *See id.* at 605; *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 755 (N.D. Ill. 2011).

---

[5] Defendants' citations to caselaw in other districts, including *Saxton v. Title Max of Ala., Inc.*, 431 F. Supp. 2d 1185, 1189 (N.D. Ala. May 4, 2006), and *Reich v. Homier Distrib. Co., Inc.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. May 22, 2005), are similarly not persuasive on this matter.

### C. Inclusion of the Investigator II position

Finally, Defendants argue that Plaintiffs "presented no evidence to support including the Investigator II position in any class," and they point out that "[n]one of the Plaintiffs hold the position" and "[n]o affidavits were submitted by any Sheriff's Office employee holding the position." (Resp. at 16.) Plaintiffs respond by highlighting the declarations of Servant and Tinoco, who aver that Investigator II's (like Correctional Officers) interact with detainees, are exposed to the virus, and are subject to the same sanitization protocols. (Reply at 9.)

Investigator II's cannot be included in the proposed class for the same reason that the court declines to certify a class of Correctional Officers: Plaintiffs have not provided any evidence that Investigator II's were subject to a common policy to engage in certain sanitization activities before and/or after their shifts. The two short paragraphs from declarants Servant and Tinoco (both Correctional Officers)--stating that Investigator II's are subject to the same protocols are Correctional Officers--are insufficient. As explained, the court is not satisfied that those protocols on their face require overtime work. In any case, neither Servant nor Tinoco declares that they witnessed or otherwise know that Investigator II's engage in the same daily activities as Correctional Officers: washing and sanitizing themselves, their uniforms, their duty belts, their PPE, or their vehicles, before and/or after their shifts, for 20 to 30 minutes a day, without compensation. Without such a declaration—or some other factual basis—the court cannot conclude that Investigator II's are similarly situated to the named plaintiffs.

Plaintiffs may be correct that they need not necessarily submit a declaration from an Investigator II. *See Russell*, 575 F. Supp. 2d at 928 ("The fact that the affidavits [plaintiff] has submitted are all from Service Representatives, Customer Service Representatives, Sales and Service Representatives, rather than any of the other customer service and sales-related positions she seeks to include in this action, does not reflect a lack of similarity at this stage of the case."); *see also Jirak*, 566 F. Supp. 2d at 849 ("[T]o be similarly situated, the class members need not have identical positions with identical titles, functions, or pay, they just needed to perform

17

the same general job."). But if Plaintiffs can otherwise make a case for conditional certification, the court assumes it will be a relatively simple matter for Plaintiffs to provide a declaration from at least one employee holding the position of Investigator II.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for conditional class certification and court-authorized notice [66] is denied without prejudice.

ENTER:

Dated: March 18, 2022

REBECCA R. PALLMEYER
United States District Judge

---

[6] Defendants also raise a number of concerns with Plaintiffs' proposed opt-in notice. (Resp. at 16-18.) Plaintiffs, in response, agree to the majority of Defendants' suggested changes. (Reply at 9-10.) If Plaintiffs move again for conditional certification, the court directs them to incorporate the agreed-upon changes. The court will resolve any outstanding disagreements at that time.