**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID EVANS III, RASHID MUHAMMAD, MONTA SERVANT, FELISHA PARNELL, DWIGHT ANDERSON, JOSEPH TINOCCO and FRANK DONIS,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS J. DART, Sheriff of Cook County, COUNTY OF COOK, a unit of local government as join employer for FLSA purposes and as indemnitor,<br><br>Defendants. | No. 20 C 2453<br><br>Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs David Evans III, Rashid Muhammad, Monta Servant, Felisha Parnell, Dwight Anderson, Joseph Tinoco, and Frank Donis worked as Correctional Officers in the Cook County Jail. Plaintiffs allege that, during the heart of the COVID-19 pandemic, Defendants (Cook County and Thomas J. Dart, the Sheriff of Cook County) violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to pay them and other similarly-situated employees for overtime work. Specifically, Plaintiffs allege that they spent significant time both before and after their assigned shifts, undertaking mandatory sanitation and de-contamination activities. For a second time, Plaintiffs have moved for conditional class certification and court-authorized notice under FLSA. And for the second time, as explained below, the court denies the motion because Plaintiffs have not identified a common policy requiring workers in the proposed class to engage in those activities as a condition of their employment.

## BACKGROUND[1]

The Cook County Department of Corrections ("CCDOC") was, at one point, the epicenter of the nation's fight against the spread of COVID-19. In April 2020, the jail was "the nation's largest-known source of coronavirus infections"; there were hundreds of known infections despite only minimal testing. *See* https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last visited September 15, 2023). Some of the correctional officers working in the jail referred to it as "Wuhan Junior"—an apparent reference to the Chinese city where COVID-19 is thought to have originated. (*See* Deposition of David Evans III ("Evans Dep") [115-4] at 203:2–21 (explaining that the Cook County jail "was the number one hotspot in the United States").) In response, CCDOC took several precautionary actions, including required masking, enhanced cleaning, and improved ventilation within the jail. (*See* Deposition of Peter Kramer [115-10] at 181:12–24.)

### I.     Plaintiffs' Allegations and Class Definition

In addition to on-premises interventions to fight COVID-19, Plaintiffs allege that CCDOC also required correctional officers to "engag[e] in decontamination/sanitation activities"[2] before or after their shifts within the CCDOC, "including washing and sanitizing their uniforms, sanitizing their persons, sanitizing and maintaining personal protective equipment ('PPE'), and showering." (*See* Second Amended Complaint ("SAC") [16] ¶ 20.) Plaintiffs allege these activities absorbed "approximately 20 to 30 minutes at the beginning and/or end of each shift" (*id.* ¶¶ 45-51), and that Defendants have never paid Plaintiffs or other correctional officers for these efforts. (*Id.* ¶ 44.) According to Plaintiffs, these activities were undertaken in addition to full workdays, often "up to

---

[1]   Because this court has already detailed Plaintiffs' allegations in two prior written orders, it summarizes only the high-level allegations again here. *See Evans v. Dart*, No. 20 C 2453, 2021 WL 2329372 (N.D. Ill. June 8, 2021); *Evans v. Dart*, No. 20 C 2453, 2022 WL 823883 (N.D. Ill. March 18, 2022).

[2]   For ease of reference, the court will refer to all of the alleged overtime activities as "decontamination" activities.

sixteen (16) hours straight inside the CCDOC." (*Id.* ¶¶ 32-33.) Plaintiffs claim that Defendants' failure to compensate them for those required activities violates the FLSA. (*Id.* ¶¶ 62, 71.)

Each of the named Plaintiffs worked as correctional officers in various parts of CCDOC. *See Evans v. Dart*, No. 2020 C 2453, 2022 WL 823883, at *2 (N.D. Ill. Mar. 18, 2022) (hereinafter "*Initial Class Denial*") (detailing declarations from named Plaintiffs.) Plaintiffs propose to represent the following class:

> All persons who worked, for any portion of time, as a Cook County Correctional Officer (CO1) at the Cook County Department of Corrections between January 27, 2020 and June 11, 2021 and who engaged in washing, sanitizing, or decontaminating activities as to their person, uniform, duty belt, personal protective equipment, or vehicles used in commuting to and from work contiguously after their shifts, and who were not paid for engaging in such activities.

(Pls.' Renewed Mot. to Certify Class (hereinafter "Mot.") [115] at 2.)[3] Citing a CCDOC response to a Freedom of Information Act Request, Plaintiffs estimate that some 3000 officers fit that class definition. (*See id.* at 1–2.)

## II. Deposition Testimony

In addition to the declarations attached to Plaintiffs' initial motion, *see Initial Class Denial*, 2022 WL 823883, at *3 (summarizing those declarations), Plaintiffs attach the transcripts of nine depositions totaling more than a thousand pages in support of their renewed motion.[4] (*See* SAC Exs. 4–12.)

In those depositions, each of the named Plaintiffs testified that they undertook actions to decontaminate their persons or their belongings before or after working a shift at CCDOC during the COVID-19 pandemic—activities that Plaintiffs did not undertake prior to that time. For

---

[3] Plaintiffs' initial class proposal included CCDOC employees who held the role of "Investigator II." (*See* Pls.' Initial Mot. to Certify Class [66] at 3.) Plaintiffs appear to have withdrawn those employees from the proposed class.

[4] As explained below, the court is denying Plaintiffs' motion because they cannot identify a common policy requiring the decontamination activities, meaning that the details of each Plaintiff's efforts are less relevant. Accordingly, this summary provides only a general picture of Plaintiffs' testimony and is not intended to be exhaustive.

example, Mr. Evans testified that, when he got home from the jail, he "would generally try to decontaminate [his] vehicle" and then would decontaminate "everything on [his] duty belt"—including his flashlight, handcuffs, pepper spray, magazines, and radio holder; would decontaminate his shoes and bullet proof vest; and would bag his uniforms, in order to take them to the dry cleaner "every two to three days." (Evans Dep. at 82:13–84:1.) Mr. Anderson had a similar routine. He testified that he would use a Lysol wipe on his duty belt—cleaning his handcuffs, for example—before taking off his clothes and showering right away. (Deposition of Dwight Anderson ("Anderson Dep.") [115-5] at 47:1–12.) He also ran Lysol wipes over the touch points in his car, like the seat and steering wheel. (*Id.* at 51:8–12.) Ms. Parnell undertook the same general routine, cleaning her vehicle (including vacuuming seats) and washing her uniform more often than before the pandemic. (Deposition of Felisha Parnell ("Parnell Dep." [116-6] at 59:22–61:4, 89:20–90:12.) Mr. Donis similarly decontaminated his vehicle, his belongings in his bookbag, and his uniform, in addition to vigorously showering and sanitizing his entire bathroom. (Deposition of Frank Donis ("Donis Dep.") [115-7] at 114:23–118:9, 135:6–136:5, 148:19–151:1.) Finally, Mr. Servant testified that he wiped down touchpoints in his car including the steering wheel, the door handles, and the gear shift; immediately washed his uniform and disinfected his duty belt; and spent significantly more time showering. (Deposition of Monta Servant ("Servant Dep.") [115-8] at 66:24–67:15, 74:3–75:13, 78:23–79:21, 81:3–82:3.) In sum, while each Plaintiff described slightly different activities that took slightly different amounts of time, they form a consistent narrative of enhanced decontamination activities, significantly exceeding what they did prior to COVID.

Plaintiffs acknowledged, however, that there was no explicit written policy requiring them to undertake these off-site activities. Mr. Evans testified that "the department" and various "supervisors" instructed him to decontaminate during roll call meetings where they would read and disseminate general advice from the CDC. (Evans Dep. at 103:3–105:1.) He also testified that he was instructed at roll call "to make sure that we weren't bringing anything back or taking

4

anything out" of the jail. (*Id.* at 109:9–22.) Mr. Anderson stated that no one told him he should dry clean his uniforms after every shift or shampoo his hair every day, but that he learned to do those things at roll call meetings. (Anderson Dep. at 53:15–19, 63:3–64:7.) He further testified that he was never "specifically" instructed what to do off-duty by someone from the sheriff's office, and there was no written directive to perform off-duty "cleaning activities, but Anderson did so out of "common sense." (*Id.* at 64:12–-65:10; 91:5–21). Ms. Parnell also did not recall any written directives about hygiene or PPE. (Parnell Dep. at 131:18–132:4.) Mr. Donis admitted that no one told him to wash his uniform twice, nor was he given specific instructions about off-duty tasks, though he recalls information about COVID prevention being passed out and discussed at roll call. (Donis Dep. at 195:5–196:6, 259:11–18, 300:8–302:18.) But Mr. Donis conceded that those roll call meetings did not include instructions about decontamination outside of working hours. (311:3–312:3.) Finally, Mr. Servant testified that he was given a "suggestion" to wash his uniform separately from his other clothes, but he did not remember who made this suggestion and admitted that it was not mandated. (Servant Dep. at 77:8–78:11.) Mr. Servant said he was explicitly instructed to decontaminate at roll call meetings, including at home, but did not remember who gave the instruction and did not recall any direction on this issue in writing. (*Id.* 119:18–120:24, 128:4–19.)

Plaintiffs did not report their off-duty decontamination activities to their supervisors, nor were they asked about those efforts or disciplined for failing to decontaminate properly. (*See* Evans Dep. at 155:9–12 ("Did I tell anybody I was cleaning my equipment? Not that I recall."), 216:11-17 ("I don't recall" anyone checking sanitation), 217:6–218:7 (testifying that supervisors never asked when he last cleaned his duty belt); Anderson Dep. at 79:18–80:10 (testifying that he did not recall "any correctional officer being disciplined" for failing to perform "any of the activities that we talked about"); Parnell Dep. at 102:6–14 (testifying that she had no recollection of any officer being disciplined for not cleaning their car while off duty); Donis Dep. at 228:18–229:8 (testifying that he not aware of any officer disciplined for failing to perform activities for

5

which he is requesting compensation in this lawsuit), 301:24–302:6 (testifying that he did not hear any discussion at roll call "about cleanup activities" that officers were performing "before or after" their shifts).)

Lastly, no named Plaintiff reported monitoring the time consumed by their daily decontamination activities, submitting any decontamination overtime, or asking their supervisors about decontamination overtime, although many testified that there was no clear way to submit an overtime claim for these activities in the CCDOC "Workforce" record system. (*See* Evans Dep. at 170:8–172:9 (testifying that he never asked for overtime authorization or requested to be paid for at-home activities); Anderson Dep. at 80:24–81:7 (testifying that he never sought overtime approval for decontamination activities); Parnell Dep. at 99:11–16 (testifying that she did not time her activities), 102:15–24 (testifying that she has never asked to be paid for decontamination time); Donis Dep. at 215:10–20 (testifying that he never timed the activities for which he is asking to be paid), 236:2–9 (testifying that he never asked to be paid); Servant Dep. at 142:2–15 (testifying that he did not submit overtime requests and supervisors did not witness him performing decontamination activities).)

### III. Communicable Diseases Policy

In their briefing, Plaintiffs focus a significant amount of argument on the CCDOC's written policy on "Communicable Diseases." (*See* Communicable Diseases Policy [115-13].) That policy describes a "communicable disease" as one "caused by microorganisms that are present in and transmissible through human blood, bodily fluid, tissue, or by breathing or coughing." (*Id.* at 1.) It defines an "exposure" as, among other things, when an individual "comes into contact with blood or other potentially infectious materials" or "is exposed to a person who has a disease that can be passed through the air by talking, sneezing or coughing (e.g., tuberculosis), or the individual is in an area that was occupied by such a person." (*Id.*) It states that the Sherriff's Office is "committed to providing a safe work environment for its members." (*Id.*) The policy provides that officers are "expected to use good judgment and follow training and procedures related to mitigating the risks

associated with communicable disease," including, among other things, by "[u]sing a face mask or shield if it is reasonable to anticipate an exposure to an airborne transmissible disease" and "[d]econtaminating non-disposable equipment (e.g., flashlight, control devices, clothing and portable radio) as soon as possible if the equipment is a potential source of exposure." (*Id.* at 2.) It requires officers who are exposed to disease to "[b]egin decontamination procedures immediately," obtain medical attention if needed, and "notify a supervisor as soon as practical." (*Id.* at 3.) It also provides procedures for supervisors to "investigate every exposure or suspected exposure[.]" (*Id.*)

Bradley Curry, the chief of staff at the Cook County Sheriff's Office, testified that officers were expected to follow all CCDOC policies, including the Communicable Diseases Policy. (Deposition of Bradley Curry ("Curry Dep.") [115-11] at 39:4–12.) But Curry testified that, generally, policies about officer conduct "were expectations that were expected while they're at work." (*Id.* at 144:24–145:13.) For example, although the CCDOC advised officers to avoid public transit and taxis during the pandemic, Curry testified that "we can't tell them what to do when they're off work," and instead communicated these expectations in an effort "to keep people safe." (*Id.* at 95:18–96:7.) So far as the court can tell, none of the officers cited the Communicable Diseases Policy in their depositions as a reason for conducting decontamination activities outside of their shift. Nor did any officer otherwise mention the policy. In supplemental declarations attached to their reply brief, Mr. Evans and Mr. Donis claim that they were "specifically aware of the Communicable Disease Policy" and interpreted that policy to require the decontamination activities they undertook. (*See* Supplemental Declarations [127-1].)

**IV.     Procedural History**

Prior to fact discovery, Plaintiffs moved for conditional class certification based on the allegations of their Second Amended Complaint and declarations submitted by the named Plaintiffs. Defendants also submitted several declarations. *See Initial Class Denial*, 2022 WL 823883, at *2–4 (summarizing evidence). At the time of Plaintiffs' initial motion, they primarily

7

cited emails and memoranda from CCDOC officials about COVID prevention and characterized those documents as "directives" to engage in off-duty decontamination work. *Id.* at *5. The court rejected that argument, reasoning that even if those communications "made the health suggestions . . . a *requirement* for employees," none of the so-called directives required officers to undertake the specific actions they alleged, like "washing, sanitizing, or decontaminating activities as to their person, uniform, duty belt, personal protective equipment, or vehicles . . . contiguously before or contiguously after their shifts." *Id.* at *6. Likewise, the court held that there was no "de facto policy" at issue—for example, Plaintiffs did not "allege that CCSO supervisors checked to see if officers had sanitized their uniforms and gear, or allege that supervisors required officers to certify that they had extensively showered." *Id.* at *7. In short, because Plaintiffs did not "show[] that they are 'victims of a common policy or plan that violated the law,'" the court declined to certify a class. *Id.* at *8 (internal citation omitted).

## **DISCUSSION**

Under the FLSA, covered employers must pay covered employees a minimum wage for all hours worked and "one and one-half times the regular rate" of pay for all hours worked over forty in one workweek. 29 U.S.C. §§ 206, 207. Activities that "are preliminary to or postliminary to" an employee's "principal activity or activities" are generally not compensable, 29 U.S.C. § 254(a), but that changes if the activities at issue are "an integral and indispensable part of the principal activity of the employment." *Steiner v. Mitchell*, 350 U.S. 247, 248, 256 (1956) (holding that changing clothes and showering were compensable activities for plant workers who made "extensive use of dangerously caustic and toxic materials"); *cf. Chagoya v. City of Chicago*, 992 F.3d 607, 623 (7th Cir. 2021) (holding that the time it takes SWAT operators to transport, unload, and safely store work equipment in their homes was "not integral and indispensable, but rather preliminary and postliminary," and thus not compensable). The Supreme Court in *Steiner* noted that "changing clothes and showering under normal conditions" is generally not compensable. *Id.* at 249; *see also* 29 C.F.R. § 790.7(g) ("[o]ther types of activities which . . . would be considered

8

'preliminary' or 'postliminary' activities, include . . . changing clothes, washing up or showering."); *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 208-09 (7th Cir. 2008) (holding that a postal worker's time spent putting on and removing her gloves, shoes, and work shirt was not compensable under the FLSA). But Plaintiffs here contend that their sanitization activities—which they claim Defendants required—were not undertaken under the "normal conditions" noted in *Steiner*, and thus should be compensable under the FLSA. (SAC ¶¶ 22-23.)

The FLSA authorizes a collective action on behalf of employees themselves and "other employees similarly situated" against an employer who has failed to pay for hours worked. 29 U.S.C. § 216(b); *see Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010). Collective actions are similar to class actions under Federal Rule of Civil Procedure 23, though members of an FLSA collective action "must opt into the suit to be bound by the judgment or settlement in it, while in a class action governed by Rule 23(b)(3) (a class action seeking damages) they must opt out *not* to be bound." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013). In light of that requirement, district courts can grant plaintiffs permission "to send notice to potential class members, prior to discovery, to advise them of the lawsuit's existence, their right to join the suit and how to do so." *Shiner v. Select Comfort Corp.*, No 09 C 2630, 2009 WL 4884166, at *2 (N.D. Ill. Dec. 9, 2009).

"Neither Congress nor the Seventh Circuit has specified the procedure courts should use to decide FLSA certification and notice issues, but collective FLSA actions in this district generally proceed under a two-step process." *Nicks v. Koch Meat Co.,* 265 F. Supp. 3d 841, 848 (N.D. Ill. 2017) (internal quotation marks omitted). At step one, the conditional certification stage, the court "determine[s] the size and contour of the group of employees who may become collective members and whether these potential members are 'similarly situated.'" *Id.* (citing 7B Charles A. Wright et al., Federal Practice & Procedure § 1807). The plaintiffs must show that the other employees are "similarly situated" by making a "modest factual showing sufficient to demonstrate that they and [the other] potential plaintiffs together were victims of a common policy or plan that

9

violated the law." *Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 870 (N.D. Ill. 2017). At this first step, "the court does not resolve factual disputes or decide substantive issues going to the merits." *Larsen v. Clearchoice Mobility, Inc.*, No. 11 C 1701, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011). Still, "conditional certification is not automatic." *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15 C 10447, 2016 WL 1043429, at *2 (N.D. Ill. Mar. 16, 2016). Plaintiffs must provide factual support for their allegations "in the form of affidavits, declarations, deposition testimony, or other documents." *Anyere v. Wells Fargo Co.*, No. 09 C 2769, 2010 WL 1542180, at *2 (N.D. Ill. Apr. 12, 2010).

At step two, which typically takes place after initial certification and after discovery has been completed, plaintiffs' burden is no longer only a "modest showing" of similarity. *See Molina v. First Line Sols. LLC*, 566 F. Supp. 2d 770, 786 (N.D. Ill. 2007). Instead, step two requires the court to "engage[] in a more stringent review of whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial as a collective action." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 104 (N.D. Ill. 2013).

The parties disagree on what standard applies. Plaintiffs cite the first step standard as applicable to this case, presumably because no class has been conditionally certified. (*See* Mot. at 5.) Defendants, for their part, assert that the step two standard applies here because fact discovery has closed. (Defs.' Opp. to Cert. ("Opp.") [124] at 3.) The court tends to agree with Defendants given the advanced posture of this case, but because Plaintiffs have not met even the step one standard, it need not resolve the issue definitively.

Accordingly, the court will ask only whether Plaintiffs can make a "modest factual showing" that they were victims of a "common policy or plan" that violated the FLSA. In their motion, Plaintiffs argue they have done so in three ways. First, they cite the Communicable Diseases Policy. Second, Plaintiffs argue that the CCSO "verbally required" the decontamination activities at issue, specifically through roll call instructions. Third, Plaintiffs claim that, even if the court finds no explicit written or oral requirement to decontaminate, they are entitled to prevail so long as

10

CCDOC officials were "actually or constructively aware" that Plaintiffs were undertaking those decontamination activities. The court addresses each argument in turn.

I.      **Communicable Diseases Policy**

Plaintiffs' only purported written evidence of a common policy or plan is the Communicable Disease Policy. That policy arguably covers COVID-19 (a "disease that can be passed through the air by talking, sneezing or coughing") and requires officers to decontaminate the "non-disposable equipment," an activity that makes up some of Plaintiffs' overtime claims. (*See* Communicable Disease Policy at 1–2.) Read broadly, perhaps the policy could also cover washing one's own person and uniform. (*See id.* at 2–3 (requiring decontamination of clothing that came into contact with potentially infectious materials and requiring that decontamination of hands and skin begin immediately after exposure).) In short, the court agrees with Plaintiffs that the policy could reasonably encompass "the kinds of sanitization activities" at issue in this case. (Mot. at 8.)

But there are two problems with the theory that the policy required the decontamination activities at issue here. First, Plaintiffs argue that "[n]owhere does this policy delimit its obligations to only 'on duty' or 'on the compound'" activities (Mot. at 9), but the court is not entirely convinced. True, the policy is not explicitly limited, but its context strongly suggests it applies to on-premises activities. The policy's stated aim is to "provid[e] a safe work environment." (Communicable Disease Policy at 1.) And it suggests that after an exposure, officers should "[b]egin decontamination procedures immediately." (*Id.* at 3.) It is hard to imagine how a pre-shift shower or laundering one's uniform after a drive home is consistent with that language. As another example, the policy requires officers to use a "face mask" if exposed to an airborne disease like COVID. (*Id.* at 2.) But CCDOC officials stated in writing that, while they were requiring masks on CCDOC premises, they "cannot control what [officers] do when [they] are not on duty." *See Initial Class Denial*, 2022 WL 823883, at *4. Similarly, though the policy requires decontamination on-site, it is hard to read it as requiring those activities at home. The policy appears to be aimed at

11

acute exposures to a known contaminant rather than exposure to air or surfaces that may or may not be contaminated with the COVID-19 virus. Indeed, it is hard to imagine that the policy envisions an officer "obtain[ing] medical attention" for or "notify[ing] a supervisor" about the kind of general exposure to COVID-19 in the Cook County Jail that officers suffered every day during the pandemic. (*Id.* at 3.)

But even if the court construed the policy as applying to off-site decontamination work, the second—and in the court's view, insurmountable—problem for Plaintiffs is that none of them seemed to know about the policy at the time they were undertaking those activities. As Defendants aptly put it, there is no evidence "showing that any Plaintiff was aware of the CDP or recalled its existence after the pandemic started, much less that they interpreted this policy to require them to perform the activities at issue while at home." (Opp. at 5.) Two of the named Plaintiffs thereafter submitted declarations that they were, in fact, aware of the policy and that they interpreted it was requiring them to decontaminate at home. (*See* Supplemental Declarations.) But those declarations are too convenient to pass muster. Neither Plaintiff so much as mentioned the policy in their deposition—despite being asked to explain why they believed they were required to decontaminate—nor has the policy been cited in any litigation document prior to the instant motion. (*See* Evans Dep. at 104:2–105:1 (testifying that he was told verbally to clean his gear and that supervisors would "disseminate the memorandums in roll call according to whatever the CDC was and their policies"), *id.* at 105:8–16 (responding to the question: "Where is this mandate? Where is that piece of paper that has this mandate?" by referencing roll call conversations); Donis Dep. at 259:11–19 ("Q. Did anyone specifically instruct you as to what activities you needed to perform off duty? . . . . A. No.").) Indeed, as Defendants note, although discovery revealed that CCDOC was, at times, sending out daily COVID-related messages, Plaintiffs have identified no communications referencing the policy, much less a communication which stated that the policy applied to off-premises decontamination activities. (Opp. at 5–6.)

12

Plaintiffs respond that "the policy on its face states officers are expected to follow it," meaning that officers must have known about it. (*See* Pls.' Reply in Supp. of Mot. for Class Cert. [127] ("Reply") at 4 ("It is non-sensical for the Sheriff to claim there is no evidence officers are aware of the CDP when the policy on its face imposes mandatory requirements on officers that they must follow.").) The court does not follow Plaintiffs' logic. For Plaintiffs here to be "victims of a common policy or plan that violated the law," *Grosscup*, 261 F. Supp. 3d at 870, they must have been working without compensation *because of* that policy. Common sense dictates that one cannot be victimized by a policy that is on the books but is not known or discussed or enforced. The written policy, without any credible evidence that it was knowingly followed, cannot be the basis for class certification under the FLSA, conditional or otherwise.

## II. Roll Call Instructions

Plaintiffs next argue that "they were all performing the kinds of post-shift decontamination activities" described in the complaint. (Mot. at 10.) The court accepts for purposes of this motion that Plaintiffs have described similar enough pre- and post-shift decontamination routines to qualify as "similarly situated" under the FLSA. *See* Background Section II, *supra* (summarizing testimony about the named Plaintiffs' decontamination routines); *see also* Mot. at 10–14 (summarizing testimony in greater detail). But that is not the only issue. The question is whether Plaintiffs' testimony establishes that these decontamination activities were *required*. *See Initial Class Denial*, 2022 WL 823883, at *8 (noting that the court will apply a lenient policy in evaluating "whether Plaintiffs' declarations suffice to show they are similarly situated to their proposed class," but reasoning that whether Plaintiffs were "subject to a common policy to engage in pre- and post-work sanitization activities" is a separate question). In the court's view, Plaintiffs' testimony about roll call instructions does not establish a "common policy or plan" requiring Plaintiffs to work uncompensated overtime.

Mr. Evans's testimony comes the closest—he testified that several specific supervisors instructed officers to "clean our personal items" at roll call. (Evans Dep. at 103:3–104:13.) But

13

upon further questioning, he admitted that the information distributed at roll call was "whatever the CDC was [advising] and their policies." (*Id.* at 104:14–21.) Though Evans said COVID was talked about at "every roll call, every conversation" because the jail was "Wuhan Junior" (*id.* at 104:8–16), his testimony does not establish that supervisors required Evans and other officers to perform decontamination activities outside the CCDOC premises. Other officers testified about the lack of explicit instructions at roll call meetings. As described above, Mr. Anderson admitted that he was never instructed to perform decontamination activities while off-duty, as did Mr. Donis. (Anderson Dep. at 64:12–-65:10; Donis Dep. at 311:3–312:3).

In their reply, Plaintiffs cite Mr. Evans's testimony that "every shift commander" instructed officers to "make sure that we weren't bringing anything back or taking anything out every day." (*See* Reply at 6–7 (citing Evans Dep. at 109:9–17).) That is not enough. The court is unable to infer that a command to make sure officers are not "bringing anything back or taking anything out every day" can be interpreted as a requirement that officers to clean car door handles, wash uniforms, and wipe down bullet proof vests every single day for thirty minutes. That is especially true given the roll call announcement about mandatory face masks—quoted by Plaintiffs in its entirety—which reminded officers that face masks were required on-site and encouraged them to "continue to practice social distancing and wear face masks when you are off duty" even though CCDOC "cannot control what you do when you are not on duty." (*See* Reply at 7 (quoting [85-2].) It would be illogical to assume that CCDOC officials could not enforce off-site masking requirements but could enforce off-site decontamination requirements.

### III. Actual or Constructive Knowledge

Finally, Plaintiffs argue that there need not be any policy requiring off-the-clock work so long as Plaintiffs' employer was "aware" of work being done off the clock. (Mot. at 16–17.) Put differently, Plaintiffs claim that work is "'suffered or permitted' for FLSA purposes if the employer has actual or constructive knowledge that it is being performed." (*Id.* at 17 (citing, *inter alia*, *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 399 (N.D. Ill. 2011).) But Plaintiffs

14

do not marshal persuasive evidence to support the claim that CCDOC was, in fact, aware of Plaintiffs' decontamination activities. Plaintiffs largely cite the same evidence discussed above: the Communicable Diseases Policy and Plaintiffs' testimony about roll call instructions. (*See* Mot. at 18.) The court has no doubt that, as Plaintiffs argue, the CCDOC was "obsessed" with mitigating the spread of COVID-19. (Mot. at 18.) But it does not follow that the Sheriff or his staff knew that "of course the officers were engaging in these clean-up activities." (*Id.*) That is particularly true when nearly every Plaintiff testified that they did not report their off-duty decontamination activities to their supervisors, nor did they attempt to submit overtime requests. *See* Background Section II, *supra*. Even if one Plaintiff (Mr. Evans) may have told his supervisors about those activities, that is insufficient to establish Defendants' knowledge. *See, e.g.*, *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 12234255, at *5 (W.D. Wisc. Mar. 11, 2013) (denying certification because one manager's knowledge that employees were working through their lunch break could not provide "companywide knowledge" of underreporting). As the court reasoned in its previous opinion, Plaintiffs still have not marshalled evidence of a de facto policy: for example, evidence "that CCSO supervisors checked to see if officers had sanitized their uniforms and gear" or "that supervisors required officers to certify that they had extensively showered." *See Initial Class Denial*, 2022 WL 823883, at *7.

Accordingly, the court declines to find Defendants to have been constructively aware.

\* \* \*

None of Plaintiffs' theories—the Communicable Diseases Policy, the roll call instructions, or constructive knowledge—establish that Plaintiffs were "victims of a common policy or plan that violated the law." *Grosscup*, 261 F. Supp. 3d at 870. Accordingly, the court does not reach Defendants' other objections to class certification.

## CONCLUSION

The court commends Plaintiffs for taking the COVID-19 pandemic seriously and does not doubt that Plaintiffs undertook the alleged decontamination activities because they hoped to

protect their coworkers, the detainees under their care, and the residents of their city. But the court cannot conclude that Plaintiffs undertook those actions because of a requirement from their employer. Accordingly, and for the reasons detailed above, Plaintiffs' renewed motion for conditional class certification and court-authorized notice under the FLSA [115] is denied.

ENTER:

Dated: September 15, 2023

_____
REBECCA R. PALLMEYER
United States District Judge